## WOODRUFF v. PARHAM.

The term "import," as used in that clause of the Constitution which says, that "no State shall levy any imposts or duties on *imports* or exports," does not refer to articles imported from one State into another, but only to articles imported from foreign countries into the United States. Hence, a uniform tax imposed by a State on *all* sales made in it, whether they be made by a citizen of it or a citizen of some other State, and whether the goods sold are the produce of that State enacting the law or of some other State, is valid.

ERROR to the Supreme Court of Alabama. The case being thus:

The Constitution thus ordains:

"Congress shall have power to regulate commerce with foreign nations and among the several States."

"No State shall levy any imposts or duties on *imports* or exports."

"The citizens of each State shall be entitled to all the immunities and privileges of citizens of the several States."

With these declarations of the Constitution in force, the city of Mobile, Alabama, in accordance with a provision in its charter, authorized the collection of a tax for municipal purposes on real and personal estate, *sales at auction*, and sales of merchandise, capital employed in business and income within the city. This ordinance being on the city statute-book, Woodruff and others, auctioneers, received, in the course of their business for themselves, or as consignees and

agents for others, large amounts of goods and merchandise, *the product of States other than Alabama, and sold the same in Mobile to purchasers in the original and unbroken packages.* Thereupon, the tax collector for the city, demanded the tax levied by the ordinance. Woodruff refused to pay the tax, asserting that it was repugnant to the above-quoted provisions of the Constitution. The question coming finally, on a case stated, into the Supreme Court of the State, where the first two of the above-quoted provisions of the Constitution were relied on by the auctioneers as a bar to the suit, the said court decided in favor of the tax. And the question was now here for review.

*Messrs. J. A. Campbell and P. Hamilton, for the plaintiffs in error:*

The question is: Can a State tax imports into it from other States of the Union?

That question has been answered by Chief Justice Marshall in *Brown* v. *Maryland.** The question there was the propriety of a license tax imposed by the State upon the merchant, as a prerequisite of the right to sell the imported article. After discussing the general principles involved in the constitutional prohibition upon the State to levy imposts or duties on imports or exports, and deciding that this tax, though indirect in form, was, in fact, a duty on imports, and therefore illegal, he remarks:

" It may be proper to add, that we suppose the principles laid down in this case, *apply equally to importations from a sister State.*"

It is true, the remark of the Chief Justice was not directly upon the point in judgment, but it was upon a matter of almost identical character; and when regard is had to the history of the times immediately preceding the establishment of the Constitution, and to the causes which led to its formation—the conflicting commercial claims of the several States, and the evils thereby produced, calling for the estab-

---

* 12 Wheaton, 449.

lishment of uniform laws, and the creation of a National legislation which should be uniform, the land throughout—the force of the remark falling from that eminent judge, and announced as the conclusion of the court, carries with it the weight of judicial authority.

That opinion has been declared, in *Almy* v. *California*,* to be the judgment of the court.

In that case, California, for purposes of revenue, directed a stamp tax to be imposed on bills of lading for the transportation, from any point or place in that State to any point or place without the State, of gold or silver in any form. The master of a ship, then lying in that State, refused to pay for the stamp on a bill of lading, signed by him, for the transportation from California to New York of some gold placed on his vessel, and was indicted for this violation of the law. The question then was: Is this stamp act, so required to be paid by State authority, an impost or duty on an export, within the meaning of the constitutional prohibition upon the State? It was held, by a unanimous bench, that the tax fell within the terms of the prohibition. As in this case, so in that, the transportation was between States: it was from the State of California to the State of New York. The transaction had no relation to commerce with any foreign nation. It was between two States; they alone were concerned.

The transaction was an export from one State to another State. It was, nevertheless, held to be *a case of export;* and, therefore, protected against any interference or regulation by mere State authority. If that be so, imports and exports being placed by the terms of the fundamental law upon a footing of perfect equality, as to State imposition, the import in this case is equally protected with the export in that, and the State law is equally void.

Upon the authority of the two cases cited, the argument is exhausted. The one is the complement of the other: the two cover the whole ground of import and export into and

---

* 24 Howard, 169.

from a State. They establish the rule, that no matter in what form, whether by license or by stamp duty, or by any other device, a tax may be sought to be imposed by the authority of the State upon commerce not wholly internal, the attempt is illegal, and against the theory of National sovereignty and National control, which is established over the whole field of affairs external to a State; and that this rule applies whether the portion external to the State which seeks to tax is connected with, or internal to a sister State, or concerns the business of a purely foreign nation. In either event, the power to tax that commerce does not exist; it belongs alone to the General Government, to which alone is intrusted the regulation of all those affairs which are not purely internal, and within the State.

And this would seem to result from the language used in the Constitution in the grant of power to regulate commerce; for the grant to Congress is universal.

The prohibition upon the States is correlative. They may not coin money, or make anything but gold and silver coin a tender; they may not make any law to impair the obligation of a contract; they may not lay imposts or duties on imports or exports; they may not lay any duty of tonnage; and may not make any agreement with themselves, or with foreign powers.

The incidental powers in relation to bankruptcy, post-offices, post-roads, piracies, useful inventions, and kindred matters, are all intrusted to the General Government.

These grants to the one, and prohibition on the other, seem clearly to indicate where the whole power of regulation over matters purely external to a State, or common to all, was intended to be placed.

The question here is not of pilotage, of quarantine, of police regulations, or of any power which partakes of the character of either. On the part of the State, it is an attempt to tax an article brought into it from another State, for purpose of sale: it is, so far as commerce is concerned, a burden upon the article of import, because it is a subject of commerce, and is used in commerce: it is, therefore, in

its operation, a regulation of commerce; and, it is, in its form and effect, so far as the State can make it, universal—having a uniform operation over the whole country; for it operates, so far as the city tax is concerned, on all articles of import; and, so far as the State is concerned, on all liquors coming from all the States.

. Passing by the *License Cases*,* where nearly every judge gave an opinion, and where it may be difficult to say what was adjudged, we come to the recent case of *Crandall v. Nevada*,† where the right of the citizen of a State to protection, in his property and privileges, as a subject, of the National government, against injurious legislation by a State government, is emphatically declared, and taking the various decisions of the court together we must admit that the right of the citizen of each State to frequent the ports of the other States, with his person and property, is a right of National origin and protection, and subject alone to National regulation; that no State regulation, for whatever purpose established, can in the smallest degree impair that right; and that all such State legislation, in the presence of this higher right, inhering in the citizen, and springing from the National organization, falls idle and powerless.

The power existing in Congress to regulate, its abstaining from legislation on the subject, is as expressive an enactment as the most positive declaration could be. It is a declaration that the commerce between the States shall be free.

*Mr. P. Phillips, contra:*

If the exemption now contended for were sustained, goods manufactured in the State would be subject to the tax, while goods of the same character manufactured in another State would go free.

The Constitution cannot be construed to present such a result. When it declared that "the citizens of each State shall be entitled to all the privileges and immunities of

---

* 5 Howard, 504.

† 6 Wallace, 35; and see Gibbons *v.* Ogden, 9 Wheaton, 186; Sinnot *v.* Davenport, 22 Howard, 227.

citizens of the several States," it provided for harmony by securing *equality.*

While it might be admitted, that a State cannot lay a *discriminating* tax, for the purpose of aiding its domestic manufactures, it would be strange, if its taxing power was so restricted, as to work a discrimination against its own manufacturers.

But the claim as made in this case is broader still, for the goods so brought from another State may have been imported from foreign countries. Such goods, when sold by the importer, were subject to taxation by the State in which they were thus imported and sold. When, then, goods thus subject to State taxation are carried to another State for resale, by what change are they withdrawn from this power?

The individual States possess an independent and uncontrollable authority, to raise their own revenue, for the supply of their own wants, and with the single exception of duties on imports or exports retain that authority in the most absolute and unqualified sense.*

The prohibition against taxing "imports or exports" refers exclusively to foreign commerce. Its object, as shown by the debates, was to secure those States, which from geographical position, could not import for themselves, from the exercise of the taxing power of the States whose ports they would be compelled to use.†

In the case of *Pierce* v. *New Hampshire*,‡ a barrel of gin was purchased in Massachusetts, brought coastwise to Dover, and then sold. The vendor was indicted under a State statute. The defendant sought to protect himself by asking a charge to the jury, that the law was invalid, because this gin was an *import,* and thus beyond the power of State taxation. This charge was refused and the party was convicted.

On appeal to the Supreme Court of the State the same question was made. It was again overruled, and the judgment affirmed. On writ of error to this court, it was again

---

* Federalist, No. 32.

† Madison Papers, 3d vol. 1445; License Cases, 5 Howard, 575.

‡ 5 Howard, 554.

renewed, and was discussed at some length by both sides. The judges gave separate opinions, but they concurred in affirming the judgment. This result could not have been reached if the gin had been an "import" within the meaning of the prohibition.

The expression relied on from the opinion in the case of *Brown* v. *Maryland*, that "we *suppose* the principles laid down apply equally to importations from a sister State," was not overlooked. McLean, J., speaks of it as "a *remark* which must have been made with less consideration than the other points ruled in the case." The opinions of Catron, Woodbury, and Daniels, JJ., are equally emphatic as to the construction of this prohibition.

The opinion of Taney, C. J., distinguishes this case from that of *Brown* v. *Maryland*, which related to foreign commerce, and thus concludes:

"Upon the whole the law of New Hampshire is, in my judgment, valid. For although the gin was an *import from another State*, and Congress had clearly the power to regulate such importation; yet as it had not done so, *the traffic may be regulated by the State as*      *as it is landed in its territory.*"

Now it is certain that if the gin was an "import" within the meaning of the prohibition, the question could in no wise be affected by the action or non-action of Congress, and his affirmance of the judgment was only possible on the ground that he held it not to be an "import."

This question has been frequently before the Supreme Courts of the States, and with the exception of the decision in Louisiana, they have uniformly held the view here presented.*

The case from Louisiana is rested solely upon the authority of *Almy* v. *California*. The opinion in this case was delivered by the Chief Justice.

It is true that the record showed that the bill of lading

* State *v.* Pinckney, 10 Richardson, 474; Cumming *v.* Savannah, R. M Charlton, 26; Harrison *v.* Vicksburg, 3 Smedes & Marshall, 581; Beall *v.* State, 4 Blackford, 107; Padelford *v.* Savannah, 14 Georgia, 438.

taxed by California was for gold shipped to New York; but in the argument of the case no reference is made to the question now discussed, neither in the opinion is there any reference to it, nor to the decision in the License case. On the contrary, all the illustrations used in the opinion refer to the case of foreign commerce; and whether goods shipped from one State to another were to be regarded as "exports" within the prohibition is not touched upon. This case can therefore have no influence in deciding the present controversy.

But this is not a tax on "imports" in any sense of the term. A tax on the *proceeds of sale* is in the nature of a tax on income, or on occupation measured by income, and that a portion of such income may be derived from imported goods can make no difference in testing its validity.*

Mr. Justice MILLER delivered the opinion of the court.

The case was heard in the courts of the State of Alabama upon an agreed statement of facts, and that statement fully raises the question whether merchandise brought from other States and sold, under the circumstances stated, comes within the prohibition of the Federal Constitution, that no State shall, without the consent of Congress, levy any imposts or duties on imports or exports. And it is claimed that it also brings the case within the principles laid down by this court in *Brown* v. *Maryland*.†

That decision has been recognized for over forty years as governing the action of this court in the same class of cases, and its reasoning has been often cited and received with approbation in others to which it was applicable. We do not now propose to question its authority or to depart from its principles.

The tax of the State of Maryland, which was the subject of controversy in that case, was limited by its terms to importers of foreign articles or commodities, and the proposition that we are now to consider is whether the provision of

---

* License Cases, 5 Howard, 576, 592.          † 12 Wheaton, 419.

the Constitution to which we have referred extends, in its true meaning and intent, to articles brought from one State of the Union into another.

The subject of the relative rights and powers of the Federal and State governments in regard to taxation, always delicate, has acquired an importance by reason of the increased public burdens growing out of the recent war, which demands of all who may be called in the discharge of public duty to decide upon any of its various phases, that it shall be done with great care and deliberation. Happily for us, much the larger share of these responsibilities rests with the legislative departments of the State and Federal governments. But when, under the pressure of a taxation necessarily heavy, and in many cases new in its character, the parties affected by it resort to the courts to ascertain whether their individual rights have been infringed by legislation, and assert rights supposed to be guaranteed by the Federal Constitution, they, in every such case properly brought before us, devolve upon this court an obligation to decide the question raised from which there is no escape.

The words impost, imports, and exports are frequently used in the Constitution. They have a necessary correlation, and when we have a clear idea of what either word means in any particular connection in which it may be found, we have one of the most satisfactory tests of its definition in other parts of the same instrument.

In the case of *Brown* v. *Maryland*, the word imports, as used in the clause now under consideration, is defined, both on the authority of the lexicons and of usage, to be articles brought into the country; and impost is there said to be a duty, custom, or tax levied on articles brought into the country. In the ordinary use of these terms at this day, no one would, for a moment, think of them as having relation to any other articles than those brought from a country foreign to the United States, and at the time the case of *Brown* v. *Maryland* was decided—namely, in 1827—it is reasonable to suppose that the general usage was the same, and that in defining imports as articles brought into the country,

the Chief Justice used the word country as a synonyme for United States.

But the word is susceptible of being applied to articles introduced from one State into another, and we must inquire if it was so used by the framers of the Constitution.

Leaving, then, for a moment, the clause of the Constitution under consideration, we find the first use of any of these correlative terms in that clause of the eighth section of the first article, which begins the enumeration of the powers confided to Congress.

"The Congress shall have power to levy and collect taxes, duties, imposts, and excises, . . . but all duties, imposts, and excises shall be uniform throughout the United States."

Is the word impost, here used, intended to confer upon Congress a distinct power to levy a tax upon all goods or merchandise carried from one State into another? Or is the power limited to duties on foreign imports? If the former be intended, then the power conferred is curiously rendered nugatory by the subsequent clause of the ninth section, which declares that no tax shall be laid on articles exported from any State, for no article can be imported from one State into another which is not, at the same time, exported from the former. But if we give to the word imposts, as used in the first-mentioned clause, the definition of Chief Justice Marshall, and to the word export the corresponding idea of something carried out of the United States, we have, in the power to lay duties on imports from abroad, and the prohibition to lay such duties on exports to other countries, the power and its limitations concerning imposts.

It is also to be remembered that the Convention was here giving the right to lay taxes by National authority in connection with paying the debts and providing for the common defence and the general welfare, and it is a reasonable inference that they had in view, in the use of the word imports, those articles which, being introduced from other nations and diffused generally over the country for consumption, would contribute, in a common and general way, to the sup-

port of the National government. If internal taxation should become necessary, it was provided for by the terms taxes and excises.

There are two provisions of the clause under which exemption from State taxation is claimed in this case, which are not without influence on that prohibition, namely : that any State may, with the assent of Congress, lay a tax on imports, and that the net produce of such tax shall be for the benefit of the Treasury of the United States.   The framers of the Constitution, claiming for the General Government, as they did, all the duties *on foreign* goods imported into the country, might well permit a State that wished to tax more heavily than Congress did, foreign liquors, tobacco, or other articles injurious to the community, or which interfered with their domestic policy, to do so, provided such tax met the approbation of Congress, and was paid into the Federal treasury.   But that it was intended to permit such a tax to be imposed by such authority on the products of neighboring States for the use of the Federal government, and that Congress, under this temptation, was to arbitrate between the State which proposed to levy the tax and those which opposed it, seems altogether improbable.

Yet this must be the construction of the clause in question if it has any reference to goods imported from one State into another.

If we turn for a moment from the consideration of the language of the Constitution to the history of its formation and adoption, we shall find additional reason to conclude that the words imports and imposts were used with exclusive reference to articles imported from foreign countries.

Section three, article six, of the Confederation provided that no State should lay imposts or duties which might interfere with any stipulation in treaties entered into by the United States ; and section one, article nine, that no treaty of commerce should be made whereby the legislative power of the respective States should be restrained from imposing such imposts and duties on foreigners as their own people were subjected to, or from prohibiting the exportation or

importation of any species of goods or commodities whatsoever. In these two articles of the Confederation, the words imports, exports, and imposts are used with exclusive reference to foreign trade, because they have regard only to the treaty-making power of the federation.

As soon as peace was restored by the success of the Revolution, and commerce began to revive, it became obvious that the most eligible mode of raising revenue for the support of the General Government and the payment of its debts was by duties on foreign merchandise imported into the country. The Congress accordingly recommended the States to levy a duty of five per cent. on all such imports, for the use of the Confederation. To this, Rhode Island, which, at that time, was one of the largest importing States, objected, and we have a full report of the remonstrance addressed by a committee of Congress to that State on that subject.*' And the discussions of the Congress of that day, as imperfectly as they have been preserved, are full of the subject of the injustice done by the States who had good seaports, by duties levied in those ports on foreign goods designed for States who had no such ports.

In this state of public feeling in this matter, the Constitutional Convention assembled.

Its very first grant of power to the new government about to be established, was to lay and collect imposts or duties on foreign goods imported into the country, and among its restraints upon the States was the corresponding one that *they* should lay no duties on imports or exports. It seems, however, from Mr. Madison's account of the debates, that while the necessity of vesting in Congress the power to levy duties on foreign goods was generally conceded, the right of the States to do so likewise was not given up without discussion, and was finally yielded with the qualification to which we have already referred, that the States might lay such duties with the assent of Congress. Mr. Madison moved that the words " nor lay imposts or duties on imports " be placed in

---

* 1. Elliot's Debates, 131–3.

that class of prohibitions which were absolute, instead of those, which were dependent on the consent of Congress. His reason was that the States interested in this power, (meaning those who had good seaports), by which they could tax the imports of their neighbors passing through their markets, were a majority, and could gain the consent of Congress to the injury of New Jersey, North Carolina, and other non-importing States. But his motion failed.* In the Convention of Virginia, called to adopt the Constitution, that distinguished expounder and defender of the instrument, so largely the work of his own hand, argued, in support of the authority to lay direct taxes, that without this power, a disproportion of burden would be imposed on the Southern States, because, having fewer manufactures, they would consume more imports and pay more of the imposts.† So, in defending the clause of the Constitution now under our consideration, he says: "Some States export the produce of other States. Virginia exports the produce of North Carolina; Pennsylvania those of New Jersey and Delaware; and Rhode Island, those of Connecticut and Massachusetts. The exporting States wished to retain the power of laying duties on exports to enable them to pay expenses incurred. The States whose produce was exported by other States, were extremely jealous lest a contribution should be raised of them by the exporting States, by laying heavy duties on their own commodities. If this clause be fully considered it will be found to be more consistent with justice and equity than any other practicable mode; for, if the States had the exclusive imposition of duties on exports, they might raise a heavy contribution of the other States for their own exclusive emoluments."‡ Similar observations, from the same source, are found in the 42d number of the Federalist; but with more direct reference to the power to regulate commerce.

Governor Ellsworth, in opening the debate of the Connecticut Convention on the adoption of the Constitution, says: "Our being tributary to our sister States, is in consequence of

---

* 5 Madison Papers, 486.      † 3 Elliot's Debates, 248.      ‡ 2 Id. 443–4.

the want of a Federal system. The State of New York raises £60,000 or £80,000 in a year by impost. Connecticut consumes about one-third of the goods upon which this impost is laid, and consequently pays one-third of this sum to New York. If we import by the medium of Massachusetts, she has an impost, and to her we pay tribute."* A few days later, he says: "I find, on calculation, that a general impost of five per cent. would raise a sum of £245,000," and adds: "it is a strong argument in favor of an impost, that the collection of it will interfere less with the internal police of the States than any other species of taxation. It does not fill the country with revenue officers, but is confined to the sea-coast, and is chiefly a water operation. . . . If we do not give it to Congress, the individual States will have it."†

It is not too much to say that, so far as our research has extended, neither the word export, import, or impost is to be found in the discussions on this subject, as they have come down to us from that time, in reference to any other than foreign commerce, without some special form of words to show that foreign commerce is not meant. The only allusion to imposts in the Articles of Confederation is clearly limited to duties on goods imported from foreign States. Wherever we find the grievance to be remedied by this provision of the Constitution alluded to, the duty levied by the States on foreign importations is alone mentioned, and the advantages to accrue to Congress from the power confided to it, and withheld from the States, is always mentioned with exclusive reference to foreign trade.

Whether we look, then, to the terms of the clause of the Constitution in question, or to its relation to the other parts of that instrument, or to the history of its formation and adoption, or to the comments of the eminent men who took part in those transactions, we are forced to the conclusion that no intention existed to prohibit, by *this clause*, the right of one State to tax articles brought into it from another. If we examine for a moment the results of an opposite doctrine,

---

* 2 Elliott's Debates, 192.          † 2 Id. 196.

we shall be well satisfied with the wisdom of the Constitution as thus construed.

The merchant of Chicago who buys his goods in New York and sells at wholesale in the original packages, may have his millions employed in trade for half a lifetime and escape all State, county, and city taxes; for all that he is worth is invested in goods which he claims to be protected as imports from New York. Neither the State nor the city which protects his life and property can make him contribute a dollar to support its government, improve its thoroughfares or educate its children. The merchant in a town in Massachusetts, who deals only in wholesale, if he purchase his goods in New York, is exempt from taxation. If his neighbor purchase in Boston, he must pay all the taxes which Massachusetts levies with equal justice on the property of all its citizens.

These cases are merely mentioned as illustrations. But it is obvious that if articles brought from one State into another are exempt from taxation, even under the limited circumstances laid down in the case of *Brown* v. *Maryland*, the grossest injustice must prevail, and equality of public burdens in all our large cities is impossible.

It is said, however, that, as a court, we are bound, by our former decisions, to a contrary doctrine, and we are referred to the cases of *Almy* v. *State of California* and *Brown* v. *Maryland*, in support of the assertion.

The case first mentioned arose under a statute of California, which imposed a stamp tax on bills of lading for the transportation of gold and silver from any point within the State to any point without the State.

The master of the ship Rattler was fined for violating this law, by refusing to affix a stamp to a bill of lading for gold shipped on board his vessel from San Francisco to New York. It seems to have escaped the attention of counsel on both sides, and of the Chief Justice who delivered the opinion, that the case was one of inter-state commerce. No distinction of the kind is taken by counsel, none alluded to by the court, except in the incidental statement of the *termini* of the voyage. In the language of the court, citing *Brown* v. *Maryland*

as governing the case, the statute of Maryland is described as a tax on foreign articles and commodities. The only question *discussed* by the court is, whether the bill of lading was so intimately connected with the articles of export described in it that a tax on it was a tax on the articles exported. And, in arguing this proposition, the Chief Justice says that "a bill of lading, or some equivalent instrument of writing, is invariably associated with every cargo of merchandise exported to *a foreign country*, and consequently a duty upon that is, in substance and effect, a duty on the article exported." It is impossible to examine the opinion without perceiving that the mind of the writer was exclusively directed to foreign commerce, and there is no reason to suppose that the question which we have discussed was in his thought. We take it to be a sound principle, that no proposition of law can be said to be overruled by a court, which was not in the mind of the court when the decision was made.*

The case, however, was well decided on the ground taken by Mr. Blair, counsel for defendant, namely: that such a tax was a regulation of commerce, a tax imposed upon the transportation of goods from one State to another, over the high seas, in conflict with that freedom of transit of goods and persons between one State and another, which is within the rule laid down in *Crandall* v. *Nevada*,† and with the authority of Congress to regulate commerce among the States. We do not regard it, therefore, as opposing the views which we have announced in this case.

The case of *Brown* v. *Maryland*, as we have already said, arose out of a statute of that State, taxing, by way of discrimination, importers who sold, by wholesale, foreign goods.

Chief Justice Marshall, in delivering the opinion of the court, distinctly bases the invalidity of the statute; (1.) On the clause of the Constitution which forbids a State to levy imposts or duties on imports; and (2.) That which confers on Congress the power to regulate commerce with foreign nations, among the States, and with the Indian tribes.

---

* The Victory, 6 Wallace, 382.                    † Ib. 35.

The casual remark, therefore, made in the close of the opinion, "that we suppose the principles laid down in this case to apply equally to importations from a sister State," can only be received as an intimation of what they might decide if the case ever came before them, for no such case was then to be decided. It is not, therefore, a judicial decision of the question, even if the remark was intended to apply to the first of the grounds on which that decision was placed.

But the opinion in that case discusses, as we have said, under two distinct heads, the two clauses of the Constitution which he supposed to be violated by the Maryland statute, and the remark above quoted follows immediately the discussion of the second proposition, or the applicability of the commerce clause to that case.

If the court then meant to say that a tax levied on goods from a sister State which was not levied on goods of a similar character produced within the State, would be in conflict with the clause of the Constitution giving Congress the right "to regulate commerce among the States," as much as the tax on foreign goods, then under consideration, was in conflict with the authority "to regulate commerce with foreign nations," we agree to the proposition.

It may not be inappropriate here to refer to the *License Cases*.*

The separate and diverse opinions delivered by the judges on that occasion leave it very doubtful if any material proposition was decided, though the precise point we have here argued was before the court and seemed to require solution. But no one can read the opinions which were delivered without perceiving that none of them held that goods imported from one State into another are within the prohibition to the States to levy taxes on imports, and the language of the Chief Justice and Judge McLean leave no doubt that their views are adverse to the proposition.

We are satisfied that the question, as a distinct proposition

_____

* 5 Howard, 504.

necessary to be decided, is before the court now for the first time.

But, we may be asked, is there no limit to the power of the States to tax the produce of their sister States brought within their borders? And can they so tax them as to drive them out or altogether prevent their introduction or their transit over their territory?

The case before us is a simple tax on sales of merchandise, imposed alike upon all sales made in Mobile, whether the sales be made by a citizen of Alabama or of another State, and whether the goods sold are the produce of that State or some other. There is no attempt to discriminate injuriously against the products of other States or the rights of their citizens, and the case is not, therefore, an attempt to fetter commerce among the States, or to deprive the citizens of other States of any privilege or immunity possessed by citizens of Alabama. But a law having such operation would, in our opinion, be an infringement of the provisions of the Constitution which relate to those subjects, and therefore void. There is also, in addition to the restraints which those provisions impose by their own force on the States, the unquestioned power of Congress, under the authority to regulate commerce among the States, to interpose, by the exercise of this power, in such a manner as to prevent the States from any oppressive interference with the free interchange of commodities by the citizens of one State with those of another.

JUDGMENT AFFIRMED.

Mr. Justice NELSON, dissenting.

I am unable to agree to the judgment of the court in this case. The naked question is, whether a State can tax the sale of an article, the product of a sister State, in the original package, when imported into the former for a market, under the Constitution of the United States? If she can, then no security or protection exists in this government against obstructions and interruptions of commerce among the States; and, one of the principal grievances that led to

the Convention of 1787, and to the adoption of the Federal Constitution, has failed to be remedied by that instrument. And hereafter (for this is the first time since its adoption that the clause in question has received the interpretation now given to it), this inter-state commerce is necessarily left to the regulation of the legislatures of the different States. We think we hazard nothing in saying, that heretofore the prevailing opinion of jurists and statesmen of this country has been that this commerce was protected by the clause— the subject of discussion—namely: "No State shall, without the consent of Congress, lay any imposts or duties *on imports or exports*, except what may be absolutely necessary for executing its inspection laws."

An attempt was made by the State of Maryland, in 1821, to lay a tax upon foreign imports, but which was pronounced unconstitutional by this court after an elaborate argument of counsel and a very full and carefully considered opinion of Chief Justice Marshall, concurred in by the whole court, and he closed it by saying: "It may be proper to add, that we suppose the principles laid down in this case to apply equally to importations from a sister State." A tax was attempted by the State of California, in 1857, upon an export from that State to the State of New York, but was pronounced unconstitutional by this court, the opinion delivered by the late Chief Justice. He observed: "If the tax was laid on the gold or silver exported (it was in form a stamp tax on the bill of lading), every one would see that it was repugnant to the Constitution of the United States, which, in express terms, declares that 'no State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws.'" Again he observes: "In the case now before the court the intention to tax the export of gold and silver, in the form of a tax on the bill of lading, is too plain to be misunderstood."

It is now said, however, that this clause relates only to foreign commerce, and is no prohibition against taxation upon commerce among the States; and, as we have already

said, if this be so, it is left to the unrestricted imposition by a State of duties, or tax, upon all articles imported into the same from sister States. In looking at this clause, it will be seen that there is nothing in its terms, or connection, that affords the slightest indication that it was intended to be confined to the prohibition of a tax upon foreign imports. Surely, if this had been intended, it must have occurred to the distinguished members of the Convention, it would be quite important to say so that the prohibition might not be misunderstood, especially when we take into consideration the eminent men who not only discussed and settled the terms and meaning of the clause, but to whom the whole instrument was committed for special and final revision. It would have been easy to have made the clause clear by affixing the word "foreign" before the word "imports." Then the clause would read "foreign imports," that now is affixed, by construction, a pretty liberal one of the fundamental charter of the government.

The same clause also provides: "No State shall, without the consent of Congress, lay any duty of tonnage," &c. Does this also relate to tonnage employed in foreign trade? If so, then it will be competent hereafter for the States to levy a tax upon the tonnage of vessels employed in carrying on commerce among the States, including the tonnage employed in the coasting trade. But, independently of the terms of the clause and the connection in which it is found, why should not the prohibition extend to *imports and exports* of commerce among the States? At the time of the Convention and formation of the Constitution the States were independent and foreign to each other, except as bound together by the feeble "league of friendship" in the Articles of Confederation in 1777, the second article of which provided, that "each State retains its sovereignty, freedom, and independence, and every power, jurisdiction, and right which is not by this Confederation expressly delegated to the United States in Congress assembled." And the only specified restraint then submitted to in respect to their commercial relations is found in the third section of the article, namely:

"No State shall lay any imposts or duties which may interfere with any stipulations in treaties entered into by the United States, in Congress assembled, with any king, prince, or state, in pursuance of any treaties already proposed by Congress to the courts of France and Spain." There is another provision relating to commerce among the States in the fourth article, to which we shall hereafter refer.

Now, as is seen, at the time the delegates assembled in 1787 to form the Constitution, they represented States that for all the substantial purposes of government were foreign and independent, and especially so in respect to all commercial relations among them, or with foreign countries. Looking at this condition of things, and to the delegates in the Convention representing such constituencies, is it reasonable or consistent with proper rules of construction to suppose, in the absence of any indication from the words of this clause prohibiting the tax on *imports or exports,* the members used the terms with exclusive reference to foreign countries— that is, countries foreign to the States—and not in reference to the States themselves? We again ask, if this distinction was intended, why was not the clause so framed as to indicate it on its face, and not left to mere conjecture and speculation?

Again, at the time the Convention was assembled, as it has been ever since and now is, the commerce among the States was many fold greater, and vastly more productive of wealth, independence, and happiness of the people, than all the foreign commerce of the country. Its magnitude and importance, therefore, invited protection and encouragement far beyond that of foreign commerce, and could not, and did not, escape the particular care and attention of the members of the Convention. Besides the clause in question, it is provided in the ninth section that " no tax or duty shall be laid on articles exported from any State. No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another." And in the clause conferring

upon the Federal Government the general power over commerce, it is given, in terms, " to regulate commerce with foreign nations and among the several States." The two are placed upon the same footing without any discrimination. The power is equally broad and absolute over the one as over the other. No distinction is made between foreign and inter-state commerce, and why should the specific prohibitions to be found in the Constitution in relation to this subject receive a different interpretation in the absence of any words indicating any such distinction? Take, as an example, the prohibition upon the Federal Government: "No tax or duty shall be laid on articles exported from any State." Is this clause, also, to receive the narrow and strained construction given to the one in question, and be applied only to exports to a foreign country? If so, then Congress may tax all exports from one State to another. If the terms in the clause before us do not embrace inter-state commerce, then the above clause does not. As was said by the Chief Justice in *Brown* v. *Maryland*,* " There is some diversity in the language, but none is perceivable in the act which is prohibited." Now, this is a prohibition or limitation upon the general commercial power conferred upon Congress, but if it only applies to foreign commerce, it loses more than half its efficiency as heretofore supposed to belong to it.

We will now recur to a provision in the Articles of Confederation to which we have heretofore alluded. It is the fourth section: " The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States shall be entitled to all the privileges and immunities of free citizens of the several States, and the people of each State shall have free ingress and regress to and from any other State, and *shall enjoy therein all the privileges of trade and commerce, subject to the same restrictions as the inhabitants thereof, respectively.*"

It will be seen the last clause of this article contains the doctrine of my brethren in the case before us.

---

* 12 Wheaton, 445.

The people of one State have the right of egress and regress to and from any other for the purposes of trade and commerce, and the articles may be taxed by the State into which they are carried; but there must be no discrimination. We have gone back to the Articles of Confederation, and have incorporated into the Constitution, by construction, a provision which the framers of that instrument had rejected as wholly inadequate for the protection of inter-state commerce. Instead, therefore, of adopting this article into that instrument, they adopted a more complete and thorough security to the enjoyment of the privileges of this commerce—"no State shall, without the consent of the Congress, lay any imposts or duties on imports or exports."

Why this change? If there had been no diversity of soil or climate in the States of the Confederacy, or in the mineral riches of the earth, any commercial regulation among them would have been of little importance. Foreign trade and commerce would have been their only dependence for a market of their surplus productions. The products would, as a general rule, have been common among all the States. But the fact was otherwise. From the diversity of soil and climate the Middle and Eastern States were mostly grain-growing States, and their surplus products were flour, pork, beef, butter, and cheese, with a modicum of the manufacture of woollens.

The Southern States were cotton, tobacco, and rice-growing States. It was the exchange of these commodities that constituted the bulk of inter-state commerce.

Virginia and North Carolina looked to the Middle and Eastern States for their products in exchange for tobacco, tar, rosin, and turpentine; South Carolina and Georgia for their cotton and rice. Now, the provision in the Articles of Confederation securing egress and regress for the purposes of trade and commerce furnished no protection to either State. New York and Pennsylvania could lay a tax upon all sales of cotton, tobacco, or rice within these States, which would be a tax without any discrimination; and yet it would be in fact, in its operation and effect, exclusively upon these

Southern products. So in respect to the wheat, flour, pork, beef, butter, and cheese, when shipped to these Southern States. Each State not producing the article sold, the general tax would not affect their people. We have no doubt the case before us falls within this category.

Alabama is a cotton-growing State, and depends upon the Northern States bordering on the Mississippi and Ohio Rivers for most of her corn, wheat, and flour. She cannot be, therefore, a State largely engaged in the manufacture of whiskey. The tax, so far as regards her own people, is probably nearly nominal. We see from the above view why this non-discriminating article in the Confederation was not incorporated into the Constitution. It was entirely worthless as a protection against the taxation of the inter-state commerce.

The same results will follow, applying the principle to commerce among the States as it exists at the present time. The State of Pennsylvania supplies New York with the article of coal from her mines which is consumed in that State. The trade is very great, and is increasing every year as the facilities for the conveyance of the article by railroads into the interior of the State are multiplied. According to the judgment of the court in the present case, the State of New York may tax these sales if she makes no discrimination. She may, therefore, pass a law imposing a tax on all sales of coal in the State, as the State of Alabama has done in respect to sales of whiskey. Such a law may be passed and enforced without imposing any burden upon her own people, as there is no coal of any comparative value in the State but what is brought into it from abroad. So, in turn, Pennsylvania can tax the salt and plaster of New York, carried into that State, with like impunity to her people. Massachusetts may tax the grain and flour of the West, carried into the State, by a like law, as she does not raise a sufficient supply for home consumption, and a general tax upon all sales would not harm her people. In like manner she can tax the cotton and rice of the Southern States, and sugar of Louisiana, and those in turn can tax her cotton, woollen manufacture, and shoes carried into those States.

The lumber of Wisconsin can be taxed at Chicago, its principal mart, by a general law of Illinois, without any serious prejudice to the interests of the people of that State. The gold dust and gold and silver bars of California carried to New York can be taxed upon a like principle without prejudice to her people.

We have extended this discussion much further than we had intended, and will close it by referring to the views expressed by Judge Story on this clause of the Constitution. After stating the history of the clause in the Convention, he observes, in his valuable Commentaries on the Constitution:* "So it seems that a struggle for State powers was constantly maintained, with zeal and pertinacity, throughout the whole discussion. If there is wisdom and sound policy in restraining the United States (referring to the prohibition upon it in respect to articles exported from the State) from exercising the power of taxation unequally in the States, there is, he observes, at least equal wisdom and policy in restraining the States themselves from the exercise of the same power injuriously to the interests of each other. A petty warfare of regulation is thus prevented which would rouse resentments and create dissensions to the ruin of the amity of the States. The power to enforce their inspection laws is still retained, subject to the revision and control of Congress. So that sufficient provision is made for the convenient arrangement of the domestic and internal trade whenever it is not injurious to the general interests."

Judge Story entertained no doubt but that this clause applied to the domestic and internal commerce of the States, as well as to the foreign. We have, therefore, the deliberate opinions of Marshall, and Taney, and Story concurring in this construction—great names in this and in every country where jurisprudence is cultivated as a science, and especially eminent at home as expounders of our constitutional law.

* Vol. i, § 1016.