Ex parte EAGLESFIELD.

(District Court, E. D. Wisconsin. June 3, 1910.)

1. COMMERCE (§ 21*)—INTERSTATE COMMERCE.
The owner of a vessel enrolled under the federal statutes, licensed for foreign and domestic trade, and cleared from the port where the license was issued, who took a cargo of potatoes from a point in Michigan to Milwaukee, where she exposed them for sale on the vessel, was engaged in interstate commerce under a valid coasting license.
[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 10; Dec. Dig. § 21.*]

2. COMMERCE (§ 40*)—INTERSTATE COMMERCE.
The right to trade in interstate commerce includes the right to sell.
[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 29; Dec. Dig. § 40.*]

3. COMMERCE (§ 33*)—INTERSTATE COMMERCE.
Potatoes brought from one state to another on a vessel remained an import until sold and delivered on the deck.
[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 26; Dec. Dig. § 33.*]

4. COMMERCE (§ 64*)—INTERSTATE COMMERCE—LICENSES.
One trading in interstate commerce under a valid coasting license is not subject to a state or municipal license.
[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 104; Dec. Dig. § 64.*]

5. COMMERCE (§ 64*)—INTERSTATE COMMERCE—TAXATION.
A cargo in interstate commerce is not subject to taxation by a state.
[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 104; Dec. Dig. § 64.*
Taxation of interstate commerce by state, see note to Board of Assessors v. Pullman's Palace Car Co., 8 C. C. A. 492.]

6. LICENSES (§ 7*)—ORDINANCE—REASONABLENESS—PROHIBITIVE PROVISIONS.
An ordinance under Laws Wis. 1905, c. 490, relating to the licensing of particular occupations, requiring transient merchants to pay $20 a day, is unreasonable and void as being prohibitive.
[Ed. Note.—For other cases, see Licenses, Cent. Dig. § 15; Dec. Dig. § 7.*]

Application by Elizabeth Eaglesfield for a writ of habeas corpus. Petitioner discharged.

This is a habeas corpus proceeding. The petitioner is a resident of Grand Rapids in the district of Michigan. She is the owner of the gas screw steamer "The Golden Girl," which vessel was duly enrolled pursuant to title L of the Revised Statutes of the United States, entitled "Regulation of Vessels in Domestic Commerce." She was licensed at the port of Grand Haven in the district of Michigan to carry on a coasting and foreign trade on the northern, northeastern, and northwestern frontier for one year from the 19th day of August, 1909. After stating certain conditions to be observed at all times by said vessel in such coasting trade, the license concludes as follows: "License is hereby granted for the said gas screw vessel called 'The Golden Girl' to be employed in foreign and domestic trade, for one year from the date hereof, and no longer."

Within the period covered by said license, and on or about the 20th of April, 1910, said vessel cleared from the port of Grand Haven for the South Manitou Islands in the state of Michigan, where she took on board a cargo of potatoes, and, in pursuit of her occupation as a coasting trader,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

arrived at the port of Milwaukee, Wis., on the 9th day of May, 1910. The vessel was moored at a dock in Milwaukee river, which is a navigable stream of the United States, and exposed said potatoes for sale upon the said vessel. The petitioner was thereupon arrested for a breach of a city ordinance of the city of Milwaukee, and was held to bail upon complaint alleging that the petitioner on the 13th day of May, 1910, at Milwaukee, "did then and there engage in and follow the business of a transient merchant in the state of Wisconsin, within the meaning of chapter 490 of the Laws of Wisconsin for 1905, without first having obtained a license therefore." On the 27th of May, 1910, the petitioner was found guilty of said offense by the district court of Milwaukee county, which imposed a fine of $50 and costs, in default of which the petitioner was committed to the house of correction for 30 days. Thereupon this application was made for a writ of habeas corpus.

The business of a transient merchant is defined in section 5 of chapter 490, as follows:

"A transient merchant within the meaning of this act is defined as one who engages in the vending or sale of merchandise at any place in this state temporarily, and who does not intend to become, and does not become a permanent merchant of such place."

Which definition is adopted by the ordinance of the city of Milwaukee under which the arrest was made. By said state law it is provided that every such transient merchant may be licensed upon paying into the state treasury $75, and, in addition to such amount, by paying into the treasury of any city or village where he may be conducting his business a sum not exceeding $25 per day, to be determined by ordinance of such place. The Milwaukee ordinance requires $20 a day.

This state law is entitled "An act relating to hawkers and peddlers and various other occupations," including circuses, menageries, side shows, vaudeville, Ferris wheel, merry-go-round, shooting galleries, and transient merchants.

No evidence was offered tending to show that the potatoes in question were not wholesome, or that any cause existed whereby the public health was involved.

Daniel W. Hoan, City Atty., for City of Milwaukee.
Bloodgood, Kemper & Bloodgood, for petitioner.

QUARLES, District Judge (after stating the facts as above). There is no dispute about the facts in this case as they appear in the petition and the return.

It is contended by the petitioner as matter of law that the business transacted by her upon her boat was that of a coasting trader, within the sole jurisdiction of the federal Constitution and laws; that she was engaged in interstate commerce; that she is under the sole authority and control of the federal government, and entirely beyond the jurisdiction of the state and municipal authorities. Further, if there were any ground for municipal interference, that the regulation in question is unreasonable and prohibitory.

There is no doubt about the correctness of the procedure in this case. The writ may be issued in the discretion of a federal judge without awaiting the final determination of the state court. Ex parte Royal, 117 U. S. 241, 6 Sup. Ct. 734, 29 L. Ed. 868.

The law in this case is practically settled by two decisions of C. J. Marshall in Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, and Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678.

In Brown v. Maryland, the great Chief Justice says (page 443, 12 Wheat. [6 L. Ed. 678]):

"This indictment is against the importer, for selling a package of dry goods in the form in which it was imported, without a license. This state of things is changed if he sells them or otherwise mixes them with the general property of the state, by breaking up his packages, and traveling with them as an itinerant peddler. In the first case, the tax intercepts the import, as an import in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated until it shall have contributed to the revenue of the state. It denies to the importer the right of using the privilege which he has purchased from the United States, until he shall have also purchased it from the state. In the last cases, the tax finds the article already incorporated with the mass of property by the act of the importer. He has used the privilege he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them."

On page 444, 12 Wheat. (6 L. Ed. 678), the learned Chief Justice further says:

"But if it should be proved that a duty on the article itself would be repugnant to the Constitution, it is still argued that this is not a tax upon the article, but on the person. The state, it is said, may tax occupations, and this is nothing more. It is impossible to conceal from ourselves that this is varying the form without varying the substance. It is treating a prohibition which is general as if it were confined to a particular mode of doing the forbidden thing. All must perceive that a tax on the sale of an article, imported only for sale, is a tax on the article itself."

On page 446, 12 Wheat. (6 L. Ed. 678), the opinion continues:

"What then is the just extent of a power to regulate commerce with foreign nations, and among the several states? This question was considered in the case of Gibbons v. Ogden, 9 Wheat. 1 [6 L. Ed. 23], in which it was declared to be complete in itself, and to acknowledge no limitations other than are prescribed by the Constitution. The power is coextensive with the subject on which it acts, and cannot be stopped at the external boundary of a state, but must enter its interior. * * * If this power reaches the interior of a state, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse; one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell."

In Gibbons v. Ogden, supra, the first proposition laid down is that commerce includes navigation. Speaking of the power to regulate commerce, the court say, on page 196, 9 Wheat. (6 L. Ed. 23):

"This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. If, as has always been understood, the sovereignty of Congress, though limited to specified objects, is plenary as to those objects, the power over commerce with foreign nations, and among the several states, is vested in Congress as absolutely as it would be in a single government, having in its Constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States."

On page 212, 9 Wheat. (6 L. Ed. 23), the court further says:

"To the court it seems very clear that the whole act on the subject of the coasting trade, according to those principles which govern the construction of statutes, implies unequivocally an authority to licensed vessels to carry on the coasting trade. The first section declares that vessels enrolled by virtue of a previous law, and certain other vessels, enrolled as described in that act, and having a license in force, as is by the act required, and no others, shall be deemed ships or vessels of the United States, entitled to the privileges of ships or vessels employed in the coasting trade. This section seems to the court to contain a positive enactment that the vessel it describes shall be entitled to the privileges of ships or vessels employed in the coasting trade. These privileges cannot be separated from the trade, and cannot be enjoyed unless the trade may be prosecuted. The grant of the privilege is an idle, empty form, conveying nothing, unless it convey the right to which the privilege is attached, and in the exercise of which its whole value consists. To construe these words otherwise than as entitling the ships or vessels described to carry on the coasting trade would be, we think, to disregard the apparent intent of the act. The fourth section directs the proper officer to grant to a vessel qualified to receive it 'a license for carrying on the coasting trade,' and prescribes its form. After reciting the compliance of the applicant with the previous requisites of the law, the operative words of the instrument are: 'License is hereby granted for the said steamboat to be employed in carrying on the coasting trade for one year from the date hereof, and no longer.' These are not the words of the officer; they are the words of the Legislature, and convey as explicitly the authority the act intended to give, and operate as effectually, as if they had been inserted in any other part of the act than in the license itself. The word 'license' means permission, or authority; and a license to do any particular thing is a permission or authority to do that thing; and, if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize. It certainly transfers to him all the right which the grantor can transfer, to do what is within the terms of the license."

On page 215, 9 Wheat. (6 L. Ed. 23), the court further say:

"The license can be granted only to vessels already enrolled, if they be of a burden of 20 tons and upward, and requires no circumstances essential to the American character. The object of the license, then, cannot be to ascertain the character of the vessel, but to do what it professes to do; that is, to give permission to a vessel already proved by her enrollment to be American to carry on the coasting trade."

While certain minor changes have been made by the courts in the doctrine laid down by these two great precedents, as, for instance, that the terms "imports" and "exports" as employed in the Constitution are applicable only to the foreign trade (Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382), the fundamental principles of both opinions have been repeatedly ratified and affirmed by the Supreme Court of the United States. Perhaps the most exhaustive and elaborate review of these principles may be found in Austin v. Tennessee, 179 U. S. 350, 21 Sup. Ct. 132, 45 L. Ed. 224. In this case there was a dissent by four of the justices; but the point upon which the dissent was based was so narrow that the general principles established by these two great cases were reviewed and approved, in both opinions. So that we have here practically a concurrence of opinion by the entire bench as to the propositions involved in the instant case. The doctrine of the original package is traced back and said to rest upon the language of C. J. Marshall in Brown v. Maryland. This doctrine was

further developed in Pittsburg v. Bates, 156 U. S. 577, 15 Sup. Ct. 415, 39 L. Ed. 538; Leisy v. Hardin, 135 U. S. 100, 122, 10 Sup. Ct. 681, 34 L. Ed. 128; Schollenberger v. Pennsylvania, 171 U. S. 1, 18 Sup. Ct. 757, 43 L. Ed. 49.

The court in Austin v. Tennessee, supra (page 362 of 179 U. S., page 139 of 21 Sup. Ct. [45 L. Ed. 224]) remark:

"Of course it is one thing to force into a state, against its will, articles or commodities that can have no possible connection with or relation to the health of the people. It is quite a different thing to force into the markets of a state against its will articles or commodities which, like cigarettes, may not unreasonably be held to be injurious to health."

In the dissenting opinion (page 387 of 179 U. S., page 149 of 21 Sup. Ct. [45 L. Ed. 224]) the dissenting judges say:

"The power cannot be conceded to a state to exclude, directly or indirectly, the subjects of interstate commerce, or by the imposition of burdens thereon, to regulate such commerce, without congressional permission."

See Lyng v. Michigan, 135 U. S. 161, 166, 10 Sup. Ct. 725, 34 L. Ed. 150.

In Fairbank v. United States, 181 U. S. 283, 21 Sup. Ct. 648, 45 L. Ed. 862, and Stockard v. Morgan, 185 U. S. 27, 22 Sup. Ct. 576, 46 L. Ed. 785, the court again reviewed and reinforced the doctrine announced by C. J. Marshall.

In Leisy v. Hardin, supra, the court say in substance:

"The power vested in Congress by the commerce clause is the power to prescribe the rule by which that commerce is to be governed, and is a power complete in itself, acknowledging no limitations other than those prescribed in the Constitution. It is coextensive with the subject on which it acts and cannot be stopped at the external boundary of a state, but must enter its interior and must be capable of authorizing the disposition of the articles which it introduces, so that they may become mingled with the common mass of property within the territory entered; and while, by virtue of its jurisdiction over persons and property within its limits, a state may provide for the security of the lives, limbs, health, and comfort of persons and the protection of property so situated, yet a subject-matter that has been confided exclusively to Congress by the Constitution is not within the jurisdiction of the police power of the state."

It has been firmly settled that the transportation does not end when the voyage terminates at the point of destination; but the power of Congress continues until the goods are delivered to the consignee. Vance v. Vandercook, 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100; Adams Express Co. v. Kentucky, 206 U. S. 129, 136, 27 Sup. Ct. 606, 51 L. Ed. 987; Heymann v. Railroad Co., 203 U. S. 270, 27 Sup. Ct. 104, 51 L. Ed. 178; Adams Express Co. v. Kentucky, 214 U. S. 222, 29 Sup. Ct. 633, 53 L. Ed. 972.

The case of Osborne v. Mobile, 16 Wall. 479, 21 L. Ed. 470, was pressed upon the court as decisive of the instant case. An examination of the recent decisions of the Supreme Court demonstrates that there has been a return to the proposition laid down by Justice Marshall, that a tax on an occupation is a tax on the business, and eventually a tax on the property involved. Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Lyng v. Michigan, 135 U. S. 161, 166, 10 Sup. Ct. 725, 34 L. Ed. 150.

In Welton v. Missouri, 91 U. S. 275, 278, 23 L. Ed. 347, the court say:

> "Where the business or occupation consists in the sale of goods, the license tax required for its pursuit is in effect a tax upon the goods themselves."

In Brennan v. Titusville, 153 U. S. 304, 14 Sup. Ct. 833, 38 L. Ed. 719, the court, speaking of the Welton Case, said: While this case turned largely upon the fact of discrimination between products of other states and those of Missouri, nevertheless the decision is an adjudication that the imposition of a license tax upon the peddling of goods is a regulation of commerce.

In Le Loup v. Mobile, 127 U. S. 646, 8 Sup. Ct. 1383, 32 L. Ed. 311, the court say that in the present state of law Osborne v. Mobile, 16 Wall. 479, 21 L. Ed. 470, would not be held as sound authority. On page 648 of 127 U. S., on page 1384 of 8 Sup. Ct. (32 L. Ed. 311), the court summarize the present views of that tribunal as follows:

> "No state has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, and the reason is that such taxation is a burden on that commerce, and amounts to a regulation of it which belongs solely to Congress."

This case is cited with approval in Western Union Telegraph Company v. Kansas, 216 U. S. 1, 22, 30 Sup. Ct. 190, 54 L. Ed. ——.

Western Union Telegraph Company v. Kansas is the last reported case where the attention of the Supreme Court has been drawn to the great principles laid down by the Chief Justice in the two earlier cases cited, and concludes an unbroken line of authority sustaining the principles contended for by the applicant in the instant case.

Counsel for the city laid great stress upon certain remarks of Judge Johnson in his opinion in Gibbons v. Ogden, supra, that in the opinion of the justice the coasting license was intended to confer a status upon the vessel, rather than a privilege or authority to carry on a trade. The reasoning of C. J. Marshall on this point, in his opinion, is so clear and cogent that it vindicates itself. But the Supreme Court in later cases have repudiated the suggestion of Judge Johnson. In the License Tax Cases, 5 Wall. 462, 470, 18 L. Ed. 497, the court say:

> "It is not doubted that, where Congress possesses constitutional power to regulate trade or intercourse, it may regulate by means of licenses as well as in other modes, and in case of such regulations a license will give to the licensee authority to do whatever is authorized by its terms. Thus: Congress having power to regulate commerce with foreign nations and among the several states, and with Indian tribes, may without doubt provide for granting coasting licenses, licenses to pilots, licenses to trade with Indians, and any other license necessary or proper for the exercise of that great and extensive power, and the same observation is applicable to every other power of Congress to the exercise of which the granting of licenses may be incident. All such licenses confer authority and give rights to the licensee."

In Railroad Co. v. Husen, 95 U. S. 465, 470, 24 L. Ed. 527, the Supreme Court say:

"Transportation is essential to commerce, or rather it is commerce itself, and every obstacle to it, or burden laid upon it by legislative authority, is regulation. * * *

"But whatever may be the nature and reach of the police power of a state, it cannot be exercised over a subject confided exclusively to Congress by the federal Constitution. * * *

"The police power of a state cannot obstruct foreign commerce or interstate commerce beyond the necessity for its exercise; and under color of it objects not within its scope cannot be secured at the expense of the protection afforded by the federal Constitution. And as its range sometimes comes very near to the field committed by the Constitution to Congress, it is the duty of the courts to guard vigilantly against any needless intrusion." Page 473 of 95 U. S. (24 L. Ed. 527).

Based upon the doctrine of this case, the Circuit Court of Appeals of the Ninth Circuit, in Smith v. Lowe, 121 Fed. 753, 758, 59 C. C. A. 185, repudiates the doctrine asserted by the counsel for the city here, that a state authority must be exclusively relied upon to construe a state enactment, and that in the present case it rests with state authorities to determine whether the tax imposed by the ordinance is reasonable. On page 758 of 121 Fed., on page 190 of 59 C. C. A., the court say:

"Can state officers accomplish under the protection of a valid law the very results which the state is forbidden to authorize by legislation? Here are state officers who, if the allegations of the bill are true, are so using the police power as to obstruct interstate commerce beyond the necessity for its exercise. The contention of the appellees, followed to its logical conclusion, is that, if the act under which state officers proceed to establish a quarantine is of itself valid and constitutional, it matters not to what extent such authority be abused, nor upon what grounds or information the officers proceed. No matter how arbitrary their act, or how unfounded in necessity or reason, it must be presumed that it is done in good faith, and the bona fides thereof is not subject to investigation. By this doctrine the power of Congress to regulate interstate and foreign commerce is practically taken away and vested in the executive officer of the states. * * * The provisions of the Constitution must necessarily impose restrictions on the action of the state officers, and restrain them from exercising the police power further than is reasonably necessary to secure protection against disease."

In Re Lebolt (C. C.) 77 Fed. 587, Judge Grosscup held that the question whether an ordinance is a proper exercise of police power is one for the United States courts to decide. In Asbell v. Kansas, 209 U. S. 251, 256, 28 Sup. Ct. 485, 52 L. Ed. 778, the court hold that this court will determine for itself whether the statute is a genuine exercise of an acknowledged state power, or whether, on the other hand, under the guise of an inspection law, it is really and substantially a regulation of interstate commerce which the Constitution has conferred exclusively on Congress.

There can be no doubt—indeed it was conceded in the argument—that in any view of the case an ordinance imposing a tax of $20 a day upon the applicant, as a transient trader, was unreasonable and prohibitory. It is obvious that it would destroy the virtue and effect of a coasting license, and for that reason would be null and void.

It is worthy of notice that the statute of 1793, authorizing the enrollment of vessels for the coasting trade, and providing for coasting licenses in such trade, remains practically unchanged. During that

eventful interval a wonderful evolution has taken place in business methods and facilities for transportation by land and by water. Steamboats have driven out the enormous fleet of sailing craft; railroads have interlaced the continent, practically annihilating distance and making neighbors of the people of distant states. Primitive methods have vanished from memory. The present generation is not acquainted with the coasting trader that was formerly so large a factor in the carrying trade, and ministered so much to the convenience and comfort of the people. But the statute remains the same. The license has lost none of its validity. The principles of the law for the protection of the coasting trade are just as sacred and just as imperative as when the coasting trader was one of the chief adjuncts of interstate commerce. The federal authorities are under the highest obligation to protect this right against state or municipal infringement. As the Supreme Court has admonished us in Railroad v. Husen, supra:

"It is the duty of the courts to guard vigilantly against any intrusion."

From the showing made and the authorities herein considered, I deduce the following propositions:

First. The applicant was engaged in interstate commerce under a valid coasting license which conferred upon her a right so to do.

Second. The right to trade necessarily includes the right to sell.

Third. The potatoes in the hold of the vessel remained an import until she had sold and delivered them on the deck.

Fourth. Having acquired this right from the federal government, she cannot be required to purchase the same right from the state or municipal authorities.

Fifth. The cargo, being interstate commerce, did not fall under the taxing power of the state, and the conviction of the prisoner was an infringement upon the power exclusively conferred upon Congress.

Sixth. Under any aspect of the case, the ordinance was confessedly prohibitive, and therefore unreasonable, and consequently void.

For these reasons, the prisoner must be discharged, and an order for her enlargement may be prepared.