SALVADOR E. SUAZO, Petitioner and Appellant, v. ANDRÉS A. LUGO, WARDEN OF THE DISTRICT JAIL OF SAN JUAN, Respondent and Appellee.*

No. 4301.   Argued November 25, 1930.—Decided March 31, 1931.

*J. B. Soto* and *J. Iglesias de la Cruz* for appellant.   *R. A. Gómez* for appellee.

MR. JUSTICE TEXIDOR delivered the opinion of the Court.

Salvador E. Suazo was prosecuted by the district attorney of San Juan, P. R., for a violation of section 18 of Act No. 19 of the Legislative Assembly of Puerto Rico, enacted in 1928, to regulate the sale of foreign coffee.   The defendant having been arrested, he applied to the District Court of San Juan for a writ of habeas corpus, and after a hearing that court

---

* NOTE.—On appeal to the U. S. Circuit Court of Appeals for the First Circuit, this decision was affirmed on other grounds. See 59 Fed. (2d) 386.

finally denied the petition by an order, from which an appeal has been taken to this Court.

The law alleged to be violated reads as follows:

"Section 18.—Dealers in foreign coffee keeping official books shall have them at the disposal of the internal revenue agents for any inspection thereof which they may desire to make at any time."

The defendant Suazo refused to produce such books at the request of an internal revenue agent, as alleged by the district attorney in his information.

The petitioner alleged: That the facts with which he is charged do not constitute any public offense; that Act No. 19 alleged to be violated imposes on dealers in foreign coffee the obligation to get a license, which shall be renewed every three months, fixed at $20 for wholesale dealers, and at $5 for retail dealers; that said law imposes on said dealers the duty of affixing to the containers stamps furnished by the Treasurer of Puerto Rico at the rate of two cents for every pound of coffee sold as well as exported, and that the imposition of such internal revenue and export duties is a violation of section 3 of our Organic Act and of the Constitution of the United States.

In the appeal two errors are assigned as committed by the lower court in its order, which we will consider. Really the two errors assigned may be considered as one, that is, the declaration that the law is constitutional and valid.

In order to proceed methodically in the consideration and decision of the case, as has been done by the appellant, this Court must determine the different legal grounds or questions.

The previous cases of Nazario v. Gallardo, 40 P.R.R. 760, decided by this Court, have been cited in arguing the present case. The essential question was not submitted fully and completely in those cases.

Act No. 19 of April 19, 1928, is entitled as follows:

"An act to regulate the sale of foreign coffee, whether pure or mixed with Porto Rican coffee and to provide funds to defray the expenses of such regulation, and for other purposes."

As shown by its title, this act does not refer to the regulation of all the coffee that may be handled in Puerto Rico, but solely and exclusively to the merchandising of the coffee designated as "foreign". And if we read section 24 thereof we find that, for its purpose, foreign coffee shall be considered to be all coffee which has not been produced and harvested in Puerto Rico.

Is the present an inspection law? That is one of the first questions to be determined herein.

Of course, the title that might be given to the law is of little importance. Thus, in *Wagner* v. *City of Covington*, 251 U. S. 95, it is said:

". . . it hardly is necessary to repeat that when this court is called upon to test a state tax by the provisions of the Constitution of the United States, our decision must depend not upon the form of the taxing scheme, or any characterization of it adopted by the courts of the State, but rather upon the practical operation and effect of the tax applied and enforced."

There was involved in that case a sale license; but the imposition included the residents of the State of Kentucky as well as those of any other State. Of course, the foregoing quotation should be borne in mind, because it sets up a very important rule: that of taking into account the nature of the tax or tribute in itself, in its essence and effects, and not on account of the title given to it.

Does the Act of 1919 under consideration create a tax, an excise, an impost, or is it simply an inspection fee?

Although, as we shall state, this point is not so important as it appears at first, it is proper to say something for its determination. It is impossible to quote here all the definitions given by the different courts of the Union. But it becomes necessary to present some them.

"Taxes are burdens or charges imposed by the Legislature upon persons or property to raise money for public purposes."

This definition of Webster's dictionary was adopted and

cited in a great number of decisions; but nowhere has it been stated so forcibly as in *Loan Association* v. *Topeka*, 20 Wall. U. S. 655, from which we intend to quote more extensively in this opinion.

In *Loan Association* v. *Topeka*, 20 Wall. 655, the Supreme Court of the United States expressed itself as follows:

"It must be conceded that there are such rights in every free government beyond the control of the State. A government which recognized no such rights, which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depository of power, is after all but a despotism. It is true it is a despotism of the many, of the majority, if you choose to call it so, but it is none the less a depotism. It may well be doubted if a man is to hold all that he is accustomed to call his own, all in which he has placed his happiness, and the security of which is essential to that happiness, under the unlimited dominion of others, whether it is not wiser that this power should be exercised by one man than by many.

"The theory of our government, State and National, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers.

"There are limitations on such power which grow out of the essential nature of all free governments. Implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name. No court, for instance, would hesitate to declare void a statute which enacted that A. and B. who were husband and wife to each other should be so no longer, but that A. should thereafter be the husband of C. and B. the wife of D. Or which should enact that the homestead now owned by A. should no longer be his, but should henceforth be the property of B.

"        .      .      .      .      .      .      .      .      .      .

"The power to tax is, therefore, the strongest, the most pervading of all the powers of government, reaching directly or indirectly to all classes of the people. It was said by Chief Justice Marshall, in the case of McCulloch v. The State of Maryland, that the power to tax is the power to destroy. A striking instance of the truth of the proposition is seen in the fact that the existing tax of ten per

cent imposed by the United States on the circulation of all other banks than the National banks, drove out of existence every State bank of circulation within a year or two after its passage. This power can as readily be employed against one class of individuals and in favor of another, so as to ruin the one class and give unlimited wealth and prosperity to the other, if there is no implied limitation of the uses for which the power may be exercised.

"To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation. This is not legislation. It is a decree under legislative forms."

The power to levy taxes cannot be conceived as unlimited and arbitrary.

The first limitation on this power is to be found in its own nature. The tax which is a burden imposed on citizens to be deducted from their wealth or benefits must rest, in order to be legal, on the necessity to make provisions for public services or for the benefit of the community. This principle, which is both strictly scientific and essentially practical, has influenced every fundamental political code of civilized nations. And the Constitution of the United States, in its Article I, section 8, embodies it thus:

"The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States."

In order to make provisions for the common defence and general welfare of the United States, that is to say, of the community and for the benefit of all, this power of Congress is established and justified.

In the concurring opinion of Mr. Justice Field, in *Pollock* v. *Farmers' Loan and Trust Company,* 157 U. S. 429, we find:

"As stated by counsel: 'There is no such thing in the theory of our national government as unlimited power of taxation in Con-

gress. There are limitations', as he justly observes, 'of its powers arising out of the essential nature of all free governments; there are reservations of individual rights, without which society could not exist, and which are respected by every government. The right of taxation is subject to these limitations.' Loan Association v. Topeka, 20 Wall. 655, and Parkersburg v. Brown, 106 U.S. 487.

"The inherent and fundamental nature and character of a tax is that of a contribution to the support of the government, levied upon the principle of equal and uniform apportionment among the persons taxed, and any other exaction does not come within the legal definition of a tax."

In the note to the case of *City of New Orleans* v. *Great Southern Telephone and Telegraph Company,* 8 Am. State Reports 506, there are included several definitions of the word "tax" which in their essence agree with our theory.

Undoubtedly the law under consideration creates a burden, tax, or charge on certain industries, to wit, that of the sales in this country and that of the export of foreign coffee, meaning by that coffee which had not been cultivated, harvested, or produced in Puerto Rico; and such burden, excise, or tax encumbers only foreign coffee and the handling and merchandising of the same, and does not affect the handling and merchandising of coffee produced in Puerto Rico.

How is that charge or tax imposed? In section 2, 9, and 10 of the act in question, the tax is established in the following manner:

"Section 2.—The said person, firm or company shall, before engaging in the business of dealing in foreign coffee, whether pure or mixed with Porto Rican coffee, apply in writing to the Treasurer of Porto Rico for the corresponding license, which shall be renewed every three months. To each license, there shall be affixed internal revenue stamps, which shall be canceled, to the value of twenty (20) dollars, if the license is for a wholesale dealer, and of five (5) dollars if it is for a retail dealer. These licenses shall expire on the first day of each of the months of January, April, July, and October."

"Section 9.—All foreign coffee in the bean, raw or roasted, ground or pulverized, that may be sold at wholesale or retail within

the limits of Porto Rico (or that may be exported from Porto Rico to any point in the United States or a foreign country), shall have fastened or fixed to the sacks or containers in which it may be put or packed for sale or export, a seal or stamp on which the following shall be stamped, printed or engraved: 'Café Extranjero—Foreign Coffee.' The said seals or stamps shall be made and fastened or fixed in such a manner that, in so far as possible, they can not be imitated, changed or counterfeited, and that upon opening the sack or container the stamp will be destroyed: *Provided,* That the said seals or stamps shall be fastened or fixed to the said containers when they hold coffee in the bean or ground, produced entirely in a foreign country, or mixed with Porto Rican coffee in the bean or ground, or when they hold pulverized foreign coffee or coffee mixed with Porto Rican coffee; and that the same shall be so fastened or fixed by the person selling or exporting the said product before it goes out of the warehouse, deposit, roasting and grinding establishment, or any other place where it may be kept for sale at wholesale or retail; *Provided, further,* That when the sale be made by a wholesale dealer to a retailer doing business in Porto Rico, it shall devolve upon the latter to affix to the containers the corresponding stamp at the time of selling the product to the consumer.

"Section 10.—The seals or stamps to which the preceding section of this Act refers, shall be prepared, issued and distributed by the Treasurer of Porto Rico and their denomination shall be fixed by the said official, taking as basis the rate of two (2) cents per pound. The denomination of each seal or stamp shall also be engraved or printed on them in legible form. They shall be kept for sale and distribution at the offices of the collectors of internal revenue."

We have, then:

*a.* A license for dealing in foreign coffee.

*b.* A payment, in internal revenue stamps, of two cents for every pound of foreign coffee.

*c.* The sale, merchandising, or handling of coffee produced in Puerto Rico does not appear to be burdened, either with the requirement of a license nor with that of buying and affixing to the containers of the product any kind of stamps.

In section 24 of the act, foreign coffee is defined as all coffee which has not been produced and harvested in Puerto Rico.

In order to complete the precedents it becomes necessary to bear in mind that:

*a.* Section 23 of the cited act provides that the moneys or proceeds from the sale of the seals or stamps and from the license and fines provided in that act shall be covered into the Insular Treasury and shall constitute a special fund which shall be known as "Coffee protection fund".

*b.* That the Legislature of Puerto Rico in 1930 approved Act No. 4 authorizing the Governor of Puerto Rico to apply the balance resulting in 1930 and the previous one in the coffee protection fund after covering expenses of inspection and auditing, to the promotion of agriculture and of rural education in the coffee zones of Puerto Rico, and to the promotion of agriculture, etc.

*c.* That in the same year of 1930 the United States Congress approved a Tariff Act, whose section 319 reads as follows:

"Sec. 319. Duty on Coffee Imported into Porto Rico.

"The Legislature of Porto Rico is hereby empowered to impose tariff duties upon coffee imported into Porto Rico, including coffee grown in a foreign country coming into Porto Rico from the United States. Such duties shall be collected and accounted for as now provided by law in the case of duties collected in Porto Rico."

*d.* That by Joint Resolution No. 59 of the Legislative Assembly of Puerto Rico, approved March 5, 1930, an import duty of 10 cents per pound of coffee was levied, from August 1, 1930, on all coffee imported into Puerto Rico, said act to take effect as soon as any act is approved by the United States Government authorizing the Legislature of Puerto Rico to levy an import duty on all coffee brought into Puerto Rico.

Do such provisions of the 1928 Act regulating the sale of foreign coffee contain any imposition of taxes or do they authorize an inspection fee?

This seems to be one of the most important points in the case, and if this were so a decision could already be

found, that of *Nazario* v. *Gallardo, Treasurer, supra,* where it was said that the law created an inspection fee.

In the *Nazario* cases, *supra,* the most important question was whether it was a tax wherein recovery of the tax paid could be had by paying under protest.

In the present case the appellant through his attorney, Juan B. Soto, raises the question in other terms: Whether, be it the case of an inspection fee or of a tax, the Legislature could create an inspection, of a privileged or discriminative character, in favor of some dealers in Puerto Rican coffee to the prejudice of other dealers in foreign coffee within the same territory.

For the consideration and determination of this question it is necessary to study in an orderly and methodical way the different questions at issue.

The laws that will throw light on these problems are:

1. The United States Constitution.

2. The Organic Act of Puerto Rico.

As regards the United States Constitution, we have already mentioned how the power to levy taxes is established therein. But we are compelled to consider other points.

The first section of the Fourteenth Amendment of the Constitution is as follows:

"Section 1.—All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Reproducing in part the above precepts, which are at the same time the best guarantee of the primary rights of man and the supreme legal realization of democratic ideals and principles, section 2 of our Organic Act provides:

"That no law shall be enacted in Porto Rico which shall deprive any person of life, liberty, or property without due process of law, or deny to any person therein the equal protection of the laws."

Is the law under consideration at variance with the principle of the equal protection of the laws, or is it in harmony therewith? This is, in our opinion, the most important point in the case before us.

Undoubtedly this law discriminates between dealers in foreign coffee and those who deal in coffee cultivated and produced in Puerto Rico. While the latter can deal and trade freely and are exempt from special taxes, the former are subject to the payment of a license and to the payment of the indispensable stamps. And the discrimination is established in an unequivocal manner when giving a definition of foreign coffee, that is the coffee which we might consider as penalized by the imposition of a tax.

In *Ward* v. *Maryland*, 12 Wall. 418, there was involved a statute which specified as a requisite for dealing in goods by those who were not producers the possession of a license of different types and prices; and as regards the non-residents of Maryland, it established a different license to the amount of $300 annually. The highest type of license for dealers or merchants residing in Maryland was $150.

Ward, who was a citizen of the United States and of New Jersey and resided in New Jersey, sold by sample, within the limits of Baltimore, horse harnesses. Ward did not have the license required by the statute; he was prosecuted before a court in Baltimore, and the defendant pleaded that the statute was unconstitutional and void, but this defense was not sustained by the court, which imposed on Ward a fine of $400; and this judgment was affirmed by the Court of Appeals of Maryland. The Supreme Court of the United States held that the Maryland statute in question was unconstitutional and void because it was in conflict with Article

IV of the United States Constitution. The following paragraphs are taken from the opinion of the Court:

"Taxes, it is conceded in those cases, may be imposed by a State on all sales made within the State, whether the goods sold were the produce of the State imposing the tax, or of some other State, provided the tax imposed is uniform; but the court at the same time decides in both cases that a tax discriminating against the commodities of the citizens of the other States of the Union would be inconsistent with the provisions of the Federal Constitution, and that the law imposing such a tax would be unconstitutional and invalid. Such an exaction, called by what name it may be, is a tax upon the goods or commodities sold, as the seller must add to the price to compensate for the sum charged for the license, which must be paid by the consumer or by the seller himself; and in either event the amount charged is equivalent to a direct tax upon the goods or commodities.

\* \* \* \* \* \* \*

"Grant that the States may impose discriminating taxes against the citizens of other States, and it will soon be found that the power conferred upon Congress to regulate interstate commerce is of no value, as the unrestricted power of the States to tax will prove to be more efficacious to promote inequality than any regulations which Congress can pass to preserve the equality of right contemplated by the Constitution among the citizens of the several States. Excise taxes, it is everywhere conceded, may be imposed by the States, if not in any sense discriminating; but it should not be forgotten that the people of the several States live under one common Constitution, which was ordained to establish justice, and which, with the laws of Congress, and the treaties made by the proper authority, is the supreme law of the land; and that that supreme law requires equality of burden, and forbids discrimination in State taxation when the power is applied to the citizens of the other States. Inequality of burden, as well as the want of uniformity in commercial regulations, was one of the grievances of the citizens under the Confederation; and the new Constitution was adopted, among other things, to remedy those defects in the prior system."

The following is from the concurrent opinion of Mr. Justice Bradley:

"I concur in the opinion of the court, that the act of the legislature of Maryland, complained of in this case, discriminates in

favor of residents and against non-residents of the State, and consequently is in violation of the fourth article of the Constitution of the United States, and therefore, *protanto*, void. But I am further of opinion that the act is in violation of the commercial clause of the Constitution, which confers upon Congress the power to regulate commerce among the several States; and it would be so, although it imposed upon residents the same burden for selling goods by sample as is imposed on non-residents. Such a law would effectually prevent the manufacturers of the manufacturing States from selling their goods in other States unless they established commercial houses therein, or sold to resident merchants who chose to send them orders. It is, in fact, a duty upon importation from one State to another under the name of a tax. I therefore dissent from any expression in the opinion of the court which, in any way, implies that such a burden, whether in the shape of a tax or a penalty, if made equally upon residents and non-residents would be constitutional.''

The above excerpt leads us to a consideration not only of the constitutional precepts which we have already mentioned, but also of what is called therein the "commercial clause," that is, that part of section 8, Article I, of the Constitution, conferring on the United States Congress the power to regulate commerce with foreign countries, among the States, and with the Indian tribes. And this is one of the angles from which the appellant presents his case. The appellant further states that section 3 of our Organic Act is applicable to the theory. The legal precept cited by him is a proviso reading as follows:

"That no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Porto Rico.''

We might reach the same conclusion that the learned counsel for appellant submits in his brief. That is: section 8, Article I of the Constitution has reserved to Congress the power to regulate interstate commerce and the States cannot approve or enact legislation regulating or attempting to regulate directly or indirectly such commerce. The pur-

pose of those legal provisions being apparent, it is not difficult for us to reach the first conclusion of the appellant, that they include the prohibition to enact any discriminative legislation in regard to persons or products from different States.

Section 10 of the above-mentioned Article of the United States Constitution bars the States from establishing taxes or duties on imports or exports except in so far as it may be "absolutely necessary to enforce their inspection laws". But this does not mean that the inspection laws could be discriminative or become laws imposing taxes or duties on the exports or imports. As held by the United States Supreme Court in *Wagner* v. *City of Covington, supra,* what matters is not the name given to the tax, but the effect thereof.

Among the cases cited by the appellant in support of his first contention is that of *Minnesota* v. *Barber,* 136 U. S. 313, from which we copy and adopt the following:

". . . A discriminating tax imposed by a State operating to the disadvantage of the product of other States when introduced into the first-mentioned States is, in effect, a regulation in restraint of commerce among the States, and as such is a usurpation of the power conferred by the Constitution upon the Congress of the United States."

The statute of Minnesota in question made provisions for the inspection of cattle to be slaughtered for human consumption. Provision is made therein for the inspection of cattle and how it shall be done. As stated in the decision:

"The presumption that this statute was enacted, in good faith, for the purpose expressed in the title, namely, to protect the health of the people of Minnesota, cannot control the final determination of the question whether it is not repugnant to the Constitution of the United States. There may be no purpose upon the part of a legislature to violate the provisions of that instrument, and yet a statute enacted by it, under the forms of law, may, by its necessary operation, be destructive of rights granted or secured by the Constitution.

In such cases, the court must sustain the supreme law of the land by declaring the statute unconstitutional and void. This principle of constitutional interpretation has been often announced by this court.

"In Henderson &c. v. New York &c., 92 U.S. 259, 268, where a statute of New York imposing burdensome and almost impossible conditions on the landing of passengers from vessels employed in foreign commerce, was held to be unconstitutional and void as a regulation of such commerce, the court said that 'in whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect.'

"In People v. Compagnie Generale Transatlantique, 107 U.S. 59, 63, where the question was as to the validity of a statute of the same State, which was attempted to be supported as an inspection law authorized by section 10 of Article 1 of the Constitution, and was so designated in its title, it was said: 'A State cannot make a law designed to raise money to support paupers, to detect or prevent crime, to guard against disease and cure the sick, an inspection law, within the constitutional meaning of that word, by calling it so in the title.'

"So, in Soon Hing v. Crowley, 113 U.S. 703, 710: 'The rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the facts, or inferrible from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as 'the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments.'

"In Mugler v. Kansas, 123 U.S. 623, 661, the court, after observing that every possible presumption is to be indulged in favor of the validity of a statute, said that the judiciary must obey the Constitution rather than the law making department of the government, and must, upon its own responsibility, determine whether, in any particular case, the limits of the Constitution have been passed. It was added: 'If, therefore, a statute purporting to have been enacted to protect the public health, the public morals or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.' Upon the authority of those cases, and others that could be

cited, it is our duty to inquire, in respect to the statute before us, not only whether there is a real or substantial relation between its avowed objects and the means devised for attaining those objects, but whether by its necessary or natural operation it impairs or destroys rights secured by the Constitution of the United States."

The Supreme Court reached the conclusion that this statute which required that, for the sale in Minnesota of beef, calf, mutton, lamb, or pork for human consumption, those animals had to be inspected in Minnesota before being slaughtered, was a violation of the United States Constitution. Citation is made in the opinion of the cases of *Woodruff* v. *Parham*, 8 Wall. 123, 140; *Hinson* v. *Lott*, 8 Wall. 148; *Wellton* v. *Missouri*, 91 U. S. 275; *Railroad Co.* v. *Husen*, 95 U. S. 465, and others equally important.

The second contention of the appellant, that is, that any law requiring a license for dealing in a foreign product and not requiring the same license for dealing in similar native products is discriminative and therefore unconstitutional, is in our opinion correct in accordance with the United States Constitution and the jurisprudence.

The case cited by the appellant, *Wellton* v. *Missouri*, 91 U. S. 275 (98 U. S. in the brief), contains the same legal doctrines which we have expounded. As stated by us, it appears in a quotation in *Minnesota* v. *Barber, supra.*

The above theory is unassailable after the decision of the Supreme Court in *Voight* v. *Wright*, 141 U. S. 62. This case considered a statute requiring that all flour imported or brought into the State of Virginia to be sold therein had to be revised and marked with the inspection seal of Virginia. The opinion cites the definition given by Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, of the inspection laws, as follows:

"The object of inspection laws is to improve the quality of articles produced by the labor of a country; to fit them for exportation, or, it may be, for domestic use."

And the Court said:

"The law in question is a discriminating law, and requires the inspection of flour brought from other States, when such inspection is not required for flour manufactured in Virginia. This aspect of the case brings it directly within the principle of Brimmer v. Rebman, 138 U.S. 78, decided at the present term. The law in question in that case was another statute of Virginia, making it unlawful to sell within the State any fresh meats (beef, veal or mutton) slaughtered one hundred miles, or over, from the place at which it might be offered for sale, until it had been inspected and approved as provided in the act. Mr. Justice Harlan, delivering the opinion of the court in that case, said: 'Undoubtedly, a State may establish regulations for the protection of its people against the sale of unwholesome meats, provided such regulations do not conflict with the powers conferred by the Constitution upon Congress, or infringe rights granted or secured by that instrument. But it may not, under the guise of exerting its police powers, or of enacting inspection laws, make discriminations against the products and industries of some of the States in favor of the products and industries of its own or of other States. The owner of the meats here in question, although they were from animals slaughtered in Illinois, had the right, under the Constitution, to compete in the markets of Virginia upon terms of equality with the owners of like meats, from animals slaughtered in Virginia or elsewhere within one hundred miles from the place of sale. Any local regulation which in terms or by its necessary operation denies this equality in the markets of a State is, when applied to the people and products or industries of other States, a direct burden upon commerce among the States, and therefore, void. Welton v. Missouri, 91 U.S. 275, 281; Railroad Co. v. Husen, 95 U.S. 465; Minnesota v. Barber, 136 U.S. 313, 319.' The case of Brimmer v. Rebman was decided in accordance with these views, the law in question being held to be unconstitutional and void."

It is evident, under any name given to it, that Act No. 19 of April 19, 1928, is as shown by its context and by its resulting effect or operation a law for the protection of Puerto Rican coffee against the competition of the coffee therein called foreign coffee.

The Act of the United States Congress permitting the Legislature of Puerto Rico to establish an import duty on

foreign coffee fulfills the ends of protection, with the difference that the proceeds from that import duty is spent for the benefit of the people in general.

From a study of the foregoing jurisprudence, we come to the consideration of the new aspect in which the appellant submits the question of the constitutionality of the law. In the cases of *Nazario* v. *Gallardo, supra,* the question was different, nor was it there decided, as is done herein, whether even in the case of an inspection law such law would be discriminative. This is the new aspect of the problem.

Even in the case of an inspection law, the constitutional precepts securing the equal protection of the laws and the liberty or equality of commerce between the States, leaving the regulation thereof to Congress, cannot be disregarded or violated by the legislature of any State; and this limitation is also applicable to the legislatures of territories and possessions. This is really the legal proposition which we decide in favor of the appellant.

Act No. 19 of April 19, 1928, is unconstitutional and void. Therefore, the order appealed from must be reversed and the petition in habeas corpus of Salvador E. Suazo granted, discharging the petitioner and cancelling the bond.

Mr. Justice Hutchison concurs in the result.

Mr. Chief Justice Del Toro, dissenting.

Although I acknowledge the force of the contrary arguments, in my opinion Act No. 19 of 1928 regulating the sale of foreign coffee, which is attacked, is not unconstitutional, as it only imposes an inspection fee and the affixing of certain stamps to enable the consumer to know that what he buys is foreign and not Puerto Rican coffee. To require a foreign article sold in a state or territory of the Union to appear as such is not to interfere with interstate commerce. It would have to be shown that the fee charged in order to put the measure in practice, from its magnitude or from any other circumstance, showed the intention to prohibit or

hinder, and that it in fact hindered or prohibited interstate commerce in order to declare the law unconstitutional; and in my opinion no such thing has been shown in the present case.