## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### WOLFE ET ALS. v. McCAULL, CLERK, &c.

#### July, 1882.

CONSTITUTION—*Legislature—Governor—Keeper of rolls—Mandamus.*—The legislature passed a bill, and presented it to the governor under constitution, art. iv, § 8; but before he acted, it was recalled by a joint resolution. He returned it without approval or disapproval.

HELD:

    1. The legislature had no power to recall the bill. The governor cannot return a bill, except with his veto and objections. In this case, his return of the bill was illegal, and it not having been vetoed, became a law.

    2. Under Code 1873, ch. 14, § 14, it was the duty of the keeper of the rolls to have this bill, thus become a law, printed and published with the other acts of the general assembly; and also, upon request, to furnish the incorporators with a copy thereof properly certified.

    3. The keeper of the rolls failing to perform this duty, *mandamus* is the only appropriate remedy, and this court hath jurisdiction to award that writ in such case.

The facts are fully stated in the opinion.

*W. W. Henry* and *B. R. Wellford,* for petitioners.

*W. W. Gordon, H. H. Marshall,* and *Attorney-General F. S. Blair,* for the respondent.

CHRISTIAN, J., delivered the opinion of the court.

This is an application to this court for the exercise of its original jurisdiction by way of *mandamus.*

The facts as set forth in the petition (to which there was a general demurrer and answer by the respondent) are few and uncontroverted, and may be stated as follows:

During the session of the late general assembly, senate bill No. 23, entitled an act to incorporte the Virginia and Carolina Railroad Company, regularly passed the senate on Friday, January 20th, 1882, as shown by the printed journal of the senate, page 159. The bill was afterward sent to the house of delegates, where it was referred to the committee on roads, and was amended, as appears by the printed journal of the house of delegates, page 296.

On Thursday, February 9th, 1882, said bill as so amended was regularly passed by said house, and a motion to reconsider the vote by which the bill was passed was rejected. (House Journal, p. 303.) Thereupon the bill, as amended and passed, was returned to the senate; and on Friday, February 10th, 1882, the senate agreed to the house amendments to said bill. (See Senate Journal, p. 252.)

On the same day a motion was made to reconsider the vote by which said amendments were agreed to, and on the next day—February 11th—the motion to reconsider was voted upon and defeated. (See Senate Journal, pp. 260–267.)

And thereupon said bill, as passed by both houses, was enrolled, examined by the committee on enrolled bills, and signed by the president of the senate and the speaker of the house of delegates, as required by law,

The bill having thus been passed, examined, enrolled, and signed as required by law, was, on the 15th February, 1882, presented to the governor, as required by the 8th section of article iv, of the constitution.

After the bill had been so passed and presented to the governor—to-wit, on Thursday, February 16, 1882—a joint resolution was introduced in the Senate requesting the governor to return said bill to the general assembly, and

said resolution was passed by a recorded vote of 18 ayes to 5 noes.   See Senate Journal, p. 292.

On the next day, February 17th, the said resolution was taken up (in the house of delegates) and agreed to by a vote not recorded.   See House Journal, p. 354.

In response to this joint resolution, on the 20th February, 1882, the governor sent said enrolled bill to the Senate (see Senate Journal, p. 305), accompanied with the following communication:

" COMMONWEALTH OF VIRGINIA,
" *Governor's Office,*
"Richmond, Va., Feb. 20th, 1882.

" *To the Senate of Virginia:*

"In response to a joint resolution, passed on the 17th inst. by the general assembly, I hereby return senate bill No. 23, entitled an 'Act to incorporate the Virginia and Carolina Railroad Company.'

(Signed)          " WM. E. CAMERON."

The petition further alleges that on the same day the governor sent to the clerk of the senate for the said enrolled bill, and it was returned to him by said clerk, and that it was afterwards delivered by the governor, along with other bills to the keeper of the rolls.

The petition further alleges that the legislature did not adjourn until more than five days had elapsed after the said bill had been presented to the governor.   It is further averred in said petition that when petitioners learned that respondent, P. H. McCaull, clerk of the house of delegates and keeper of the rolls, had furnished to the superintendent of public printing for publication the manuscript of the other laws enacted by the general assembly of Virginia at its session which came to a close on the 6th of March, 1882, but had omitted to furnish the said superintendent of public printing with the manuscript of said act incor-

porating the Virginia and Carolina Railroad Company, petitioners made a formal demand in writing on said clerk and keeper of the rolls that he should perform his duty in this regard as required by law, and should also furnish petitioners a certified copy of said act from the rolls as the copy of an act of the general assembly, as is his duty under § 14, ch. 14, Code of 1873. That the said P. H. McCaull, clerk of the house of delegates and keeper of the rolls as aforesaid, has refused to furnish the manuscript of said act to the superintendent of public printing for publication, as required by law, and has expressed the determination not to do so, and has also refused to furnish petitioners with a certified copy of said act as an enrolled act of the general assembly.

The prayer of the petition is that this court may award its peremptory writ of *mandamus* to compel the said keeper of the rolls to furnish petitioners with a copy, certified by him, of said act of assembly entitled "An act to incorporate the Virginia and Carolina Railroad Company," passed by the general assembly at its regular session commencing December 7th, 1881, and ending 6th March, 1882, and designated on the calendars of the two houses as senate bill No. 23, and also commanding him to prepare the said act for publication and to furnish the superintendent of public printing the manuscript thereof properly arranged for being printed, and to cause this same to be published and indexed among the acts passed by the general assembly at the said session.

Upon this petition this court awarded a rule upon the respondent, the keeper of the rolls, to show cause why a peremptory mandamus should not be issued in accordance with the prayer of the petitioner.

The respondent appeared on the day named in the rule, and demurred to the petition, and afterwards answered the same. The demurrer of course admitted the facts set forth

in the petition, and the answer does not controvert any of the material facts.

Therefore, the questions of law we have to determine arise upon the facts fully and minutely detailed as above; and these questions may be stated as follows:

*First.* Has the court jurisdiction to hear and determine the controversy between the petitioners and respondent?

*Second.* Is the writ of mandamus the proper remedy?

*Third.* Has senate bill No. 23, in the petition mentioned, become an act of the general assembly which must be published as a part of the statute law of the State under which the rights of the petitioners are defined and secured?

1st. Has the court jurisdiction? It is one of the fundamental principles of our government, State and Federal, that the legislative power should be separate from the judicial. To enact laws, or to declare what the law *shall be,* is legislative power. To interpret law—to declare what law *is* or *has been*—is judicial power. The power to decarel what is the law of the State is delegated to the courts. The power to declare what the law is, of necessity involves the power to declare what acts of the legislature *are,* and what acts of the legislature *are not laws.* In ascertaining what acts of the legislature have the force and effect of laws, the courts are not confined to an examination only of what the proper officer of the State charged with that duty may choose to publish in books or pamphlets, purporting to contain her statutes. If this were so, it would put it in the power of the keeper of the rolls, or other officer charged with the duty of publication, to withhold or suppress such acts, and thus defeat the legislative will and impair or destroy the rights of the citizen.

In *Gardner* v. *The Collector,* 6 Wall. 499, the question arose in the supreme court of the United States, as to the power of a court of law to determine *when* an act of congress became a law. The provision of the constitution of the

United States, with respect to the action of the President in reference to the approval or vetoing and returning bills passed by the senate and house of representatives, and presented to him, is, with a single exception, *in totidem verbis,* the provision of the constitution of Virginia, with respect to the duty of the governor when a bill passed by the senate and house of delegates is presented to him. ° The only difference is that in the one case the President is given "ten days, Sundays excepted," within which to consider the bill, and which becomes a law if not returned within that time; and, in the other, the governor is given five days (Sundays excepted) within which to consider the bill, and which in like manner becomes a law if not returned in that time.

In the case above refered to, it seems that congress passed through both houses in December, 1861, a bill which declared " that from and after the *date* of the passage of the act," the duties on tea should be twenty cents per pound. A previous statute had fixed the duty at fifteen cents. The roll of the engrossed bill was taken to the President and by him thus signed, *"no year being indicated."*

Approved December 24th.

ABRAHAM LINCOLN.

Gardner in 1864 entered at the custom-house in New York certain packages of tea, on which the collector of customs there, assuming that there was a statute laying that duty, required him to pay twenty cents per pound. Gardner declined to pay twenty cents per pound on the ground that there was no statute fixing that duty, but offered to pay fifteen cents, the duty fixed by what he asserted to be the only act in the case. Being compelled to pay the twenty cents, and having paid in under protest, he brought suit in the court below to recover the excess. The

court below gave judgment against him, and on error to the supreme court, the question was (says the reporter) whether the *bill fixing the twenty cents* had passed, or in other words, whether *it was a law* on the 28th April when the teas in question were entered.

This question (very much the same now before us—viz: whether the bill had passed, and whether it was then the law) was most elaborately and learnedly discussed by counsel, and most carefully considered by the court in a carefully prepared and able opinion, delivered by Mr. Justice Miller, which concludes as follows: "We are of opinion, therefore, on principle as well as authority, that whenever a question arises in a court of law of the *existence of a statute*, or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such question, always seeking first for that which in its nature is most appropriate, unless the positive law has enacted a different rule. (See also *Town of South Ottowa* v. *Perkins*, 94 U. S. 260; Cooley's Cons. Limitations, 94 side p.)

I am of opinion, therefore, on principle as well as authority, that the question we are called upon to consider, whether senate bill No. 23 is an act passed by the legislature has become a law, is a question within judicial power, and that this court has jurisdiction to determine the controversy between the petitioners and respondent.

We come now to consider the second question: Is the the writ of mandamus the proper remedy in this case? The office of the writ of mandamus is to compel corporations, inferior courts, and officers to perform some particular duty incumbent upon them, and which is imperative in its nature, and to the performance of which the relator has a clear legal right without any other adequate specific rem-

edy to enforce it; and even though he may have another specific remedy, if such remedy be obsolete or inoperative, the mandamus will be granted. The remedy is extraordinary, and if the right be doubtful, or the duty discretionary, or there be any other adequate specific legal remedy, the writ will not be allowed. See Judge Burk's opinion in *Page* v. *Clopton, Judge,* 30 Gratt. 416, and numerous cases cited by him.

Now, applying the principles declared by these authorities to the case before us, if it can be shown that the bill in question had become an act of the general assembly, and that it was the duty of the respondent, as an officer of the State—a keeper of the rolls—to publish this act, or to furnish a certified copy to the petitioners, and he refuses to perform this official duty, then the remedy, and the only specific remedy, *is mandamus* to compel him to perform such duty.

And this brings me to the consideration of the third and last question we have to determine, to-wit: Is senate bill No. 23, in the petition and proceedings mentioned, entitled "An act to incorporate the Virginia and Carolina Railroad Company," such an act of the general assembly as became a law of the State, and which the keeper of the rolls is required by law to publish?

Now, what is required to transform a bill into an act of assembly so as to have the form and effect of a law of the State? The constitution answers that question, and answers it, I think, in plain and unmistakable terms. § 8, art. 4, declares that "Every bill which shall have passed the senate and house of delegates, and every resolution requiring the assent of both branches of the general assembly, shall, before it becomes a law, be presented to the governor; if he approves, he shall sign it; but if not, he shall return it with his objections to the house in which it shall have originated, who shall enter the objections at

large on their journal, and proceed to reconsider it. If, after such reconsideration, two-thirds of the members present shall agree to pass the bill or joint resolution, it shall be sent together with the objections to the other house, by which it shall likewise be considered, and if approved by two-thirds of all the members present, it shall become a law, notwithstanding the objections of the governor. But in all such cases, the votes of both houses shall be determined by ayes and noes, and the names of the members voting for and against the bill or joint resolution shall be entered in the journal of each house respectively. If any such bill or resolution shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the legislature shall by its adjournment prevent its return; in which case, it shall not be a law." By the express terms of the constitution, a bill to become a law must first be passed by both houses; second, it must be presented to the governor; if he approve it, he shall sign it; if not, he shall return it with his objections, &c.; third, if it shall not be returned by the governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the legislature by their adjournment shall prevent its return; in which case, it shall not be a law.

Now, the bill under consideration was passed by both houses, and a motion to reconsider the vote by which it passed was voted down in both houses. It was presented to the governor—and the only question is, Was it ever "*returned*" by him within the meaning of the constitution? If the governor refuses to sign a bill, How must he *return* it as required by the constitution? Its terms are plain and specific he shall return it *with his objections;* not only so, but he must return it with his objections *to the house in which it*

*originated, who shall enter the objections at large on their journal*—and then the constitution points out the mode by which such bill may become a law, notwithstanding his objections.

Now, the question is, Was senate bill No. 23 ever returned by the governor, in the sense and in the mode required by the constitution? Let us see. On the 20th February, 1882, he sent the following communication in response to a joint resolution, passed on the 17th instant by the general assembly :

"I hereby return senate bill No. 23, entitled 'An act to incorporate the Virginia and Carolina Railroad Company.'"

Is this such *return* as is contemplated by the constitution? Is this brief communication of three lines, which contains no word of objection to be construed into a return "with his objections," to the house in which the bill originated? And how would that house proceed to "enter at large on its journal" these "objections" when there is not one word of objection in the communication? And when thus returned with this communication, would the most ignorant parliamentarian in either house contend that it required a *two-thirds vote* to pass the bill over these objections, which were no objections, and which were not, and could not be spread upon the journal? The truth is, that the governor never suspected that he was performing the official duty imposed by the constitution in making this communication. This is demonstrated by the fact stated in the petition, admitted by the demurrer, and not denied in the answer, that on the same day this communication was made he sent for this bill, and it was "returned" to him. It is plain that the action of the governor was a mere act of courtesy on the part of one co-ordinate branch of the government towards another, and was not intended and cannot be construed as a compliance with

the requirements of the constitution, that if he do not approve it, "he shall return it (the bill), with his objections, to the house in which it shall have originated, who shall enter the objections at large on their journal."

The constitution prescribes with minuteness the course the governor must pursue with regard to bills placed in his hands, and its mandates are imperative. (Cushing, p. 931, § 2435; Cooly Con. Lim. 115.) The constitution fixed his duty. He cannot evade that duty if he would, by allowing the legislature to recall the bill from his hands, and to defeat, by mere non-action, a measure they have once declared, with due solemnity, to have passed.

As was said by Judge Potter, in *The People* v. *Devlin*, 33 New York, p. 277, a case very similar to this in many respects, the act of courtesy of the governor in returning to the general assembly the bill at their request, conferred no power upon the houses of assembly to act further upon it. Even if the governor had intended to allow them so to act (as by his subsequently signing the bill in the form he first received it seems he did not), it is still a question of power. No authority is shown to be possessed by the governor to perform such an act as a part of the law-making power. If the assembly possessed the power of recalling bills from the governor after being passed by both houses and sent to him, it is not found in parliamentary law, and no custom of that kind is shown.

I think it is plain, under the provision of the constitution, that the governor must choose one of two courses. He must either act by approving or disapproving a bill or allowing it to become a law without his approval by the force and effect of the constitution itself. There is no way in which he can escape this choice. No power is given him to return a bill to the legislature, except in the case of a veto; and, by failing to veto it or return it with his objections, he allowed it to become a law without his approval.

In the same case, Judge Potter says (and his reasoning applies with full force to the question before us), "After the passage of a bill in the legal and constitutional form, by both houses of the legislature, and the same has been transmitted by them to the governor, in the manner provided in the constitution, have the two houses exhausted their power over it; or, can they, or can either of the said houses, recall the bill by resolution and revest themselves with power further to act upon it? If they do possess the power, it is not found in the constitution. It is not shown to be the custom or usage. Although each house shall determine the rule of its own proceedings, no rule for such a proceeding as that of sending for a bill in the possession of the governor has been shown to exist; besides the bill at that time had become the act of both houses, and neither had then any further control over it."

In *Harpending* v. *Height,* 39 Cal. 189, the precise question we are now considering, came before the supreme court of California—to-wit: whether the governor made to the senate in which it had originated the "return required by the constitution"? The provision of the California constitution is precisely like ours, except *ten* days instead of *five* are given for consideration. After elaborate discussion of the question, the court unanimously held that "the return of a bill made to the house in which it originated, but so made that the house can neither reconsider the bill, nor examine the objections to its passage, do not in either case constitute the presentation or return required by the constitution."

The court, speaking of the elements of a return under the constitution of California, which in this respect is identical with ours, says: "It must be a step taken by which his own time for deliberation is ended, and that for the deliberation of the senate is begun; that the bill itself must be put beyond the executive possession; * * * * that as

part of the return the executive objections to the passage of the bill must be stated. For, unless these things be effected by the return, how can the senate enter the bill and executive objections upon its journal, or in what way proceed to the consideration of the objections themselves? Yet the constitution enjoins upon the senate the performance of these several acts upon the return of the bill and objections to it." See also 12 Bush (Ky.), 727, 732; 52 Geo. 222-3; *Zarltus* v. *Peggs,* 18 Ind. 24; Soldier Voting Bill, 45 N. H. 610.

Upon these authorities, and for the reasons above given, I am clearly of opinion that the return of the bill with the brief communication from the governor, was not such a return of the bill as is contemplated by the constitution. The very language of that communication negatives the idea that he disapproved the bill. It states no ground of objections, but returns it in response to a joint resolution of the general assembly *requesting* a return of the bill. The truth is, the bill was never beyond the executive control, as shown by the fact that the governor, on the very day of its return to the senate, sent for the bill, and it was returned to him by the clerk of the senate and kept by him until it was placed in the hands of the keeper of the rolls, together with other bills. I think the mere delivery by the governor of this bill to the senate, at the request of the general assembly, was of no effect, but was merely an act of courtesy which was of no legal effect, and in contemplation of law the bill never left the governor's hands until it was placed in the hands of the keeper of the rolls.

I propose now to consider very briefly the question, Did the legislature, by joint resolution, have the power to recall the bill from the governor after it had been passed by both houses and sent to the governor? This involves the inquiry, *When* does the power of control over a bill passed by both houses cease and determine?

There must be a time, in all parliamentary proceedings, when the controlling power of the legislative body must come to an end.

If the general assembly had the power to recall the bill, it must have been for the purpose of a reconsideration. The object of requiring possession of the paper must have been for a reconsideration, because no motion to reconsider it is in order unless the paper is before the body in which the motion to reconsider is made. (Jefferson's Manual, 93.) But in Virginia the rules of both houses of the general assembly fix the time and mode by which a bill passed may be reconsidered.

By the constitution each house is allowed to adopt its own rules. House rule 70 provides that "when a question has been decided, it may be reconsidered on the motion of any member who voted with the prevailing side, provided the motion be made on the same day or the next two days of actual session." Rule 61 of the senate is to the same effect. (See also Jefferson's Manual, p. 92, which is adopted by both houses as their guide.)

According to these rules, and the general practice, a motion to reconsider the same vote cannot be made twice, and if made at all, must be made upon the day of the vote or upon one of the two ensuing days. In the case before us, a motion to reconsider was made in each house within the proper time and was lost. (See House Journal, 303, and Senate Journal, 261–267.) After this was done, and after it was sent to the governor, the legislature had no further control over the bill. It was then before the governor for his action or non-action, and was beyond the control of the legislature.

In *People* v. *Hatch*, 19 Ill., the court, speaking of the power of reconsideration possessed by the legislature and the executive, says:

" There must be a time when the right to reconsider ter-

minates, and the same rule applies in the one case as in the other, and that is when the bill or law has passed from the custody or control of the department seeking to reconsider." * * * "And this right to reconsider remains so long as the bill is in the custody of the body proposing to reconsider unless they have some special rule restraining the right to reconsider."

It has been suggested in argument here that the passage of the joint resolution requesting the return of the bill operated as a repeal of rules of the house, and that the bill was again before them for reconsideration. I think that this view is not a sound one. Of course each house has the right, under the constitution, to adopt its own rules. But when those rules are once adopted, they must govern each house until repealed and another rule is established in its stead. No joint resolution (passed, it may be, when the house may have a bare quorum) relating to a particular bill, can have the effect to strike out a rule carefully considered and adopted for the guidance of the house in all cases. This can only be done by the formal abrogation of the rule and the adoption of another in its place.

To hold otherwise, and to declare that by a joint resolution the general assembly might retain its power over a bill after it had been passed, and after motion to reconsider made and voted down within the time prescribed by the rules, there could be no finality to legislative proceedings. Besides, such a construction in favor of the powers of the legislature would trench upon the power and prerogative of the governor.

As was so well said by one of the able counsel for the petitioners, in a brief filed by him (Mr. Wellford): "The constitution, moreover, provides that all bills shall be presented to the governor—that is, presented to the governor in such a way that he will be able to consider the merits and demerits of a bill, deliberate upon it, and finally determine whether he will approve or disapprove. The consti-

tution contemplates that he shall exercise this power without let or hindrance from any source whatever. He could not properly perform this duty and fully enjoy this privilege, if at any moment the bill under consideration could be recalled from his hands by a resolution passed by a minority of both houses, who avail themselves of a temporary ascendancy caused by the absence of the friends of the bill, or even by a majority of both houses. To allow such a power to the legislature would tend to produce a constant conflict between it and the executive, and in the unequal contest that would ensue, the executive would have to succumb to its more powerful opponent. In the exercise of this power, although a legislative function, the independence of the executive should be guarded with the same zealous care as his independence in the exercise of his ordinary executive duties; and to allow the legislature the power claimed by them in this instance would be entirely subversive of that independence."

I am of opinion, therefore, that senate bill No. 23 having been passed by both houses of the general assembly, and a motion to reconsider having been voted down by both houses, and the bill having been presented to the governor, and never having been returned to the legislature in the sense contemplated by the constitution, but having been retained by him for more than five days, and the legislature not having adjourned within that period—said bill became an act of assembly and a part of the statute laws of the State, by which certain rights and franchises vested in the petitioners; and that it was the duty of the respondent, P. H. McCaull, clerk of the house of delegates, and as such keeper of the rolls, to publish the same, in accordance with the provisions of sec. 14, ch. 14, of the Code of 1873. And to this end a peremptory mandamus must be awarded by this court.

MANDAMUS AWARDED.