STATE, *ex rel.* FLORIDA PORTLAND CEMENT COMPANY, v. A. B. HALE as Chairman, and E. A. McCOLSKEY, *et al.,* as and constituting the State Road Department of the State.

176 So. 577.

Division A.

Opinion Filed October 12, 1937.

Rehearing Denied November 12, 1937.

*Whitaker Brothers,* for Relator;

*Richard P. Daniel* and *Fred H. Kent,* for Respondents.

BUFORD, J.—This is an original proceeding in mandamus. Alternative writ was issued on July 27, 1937, to which the respondents have filed demurrer, which will be considered as motion to quash. The purpose of the writ was to coerce the State Road Department of the State of Florida to comply with the provisions of Senate Bill No. 760, which became a law when it was filed in the office of the Secretary of State on June 5, 1937. We quote the legislative Act in full for the benefit of the bench and bar, as follows:

"AN ACT Providing for the Fixing of a Minimum Standard for all Cement Offered for Sale, Sold or Used in the State of Florida and to Authorize and Empower the State Road Department of the State of Florida to Write Rules and Regulations for the Effectual Enforcement of this Act; Providing for the Inspection of all Cement Imported and Brought into the State of Florida from any Foreign Country and Providing for an Inspection Fee to be Paid for the Inspection of all Cement Imported and Brought into the State of Florida from any Foreign Country and Offered for Sale, Sold or to be Used in the State of Florida; Providing Penalties for the Violation of any of the Provisions of this Act as well as any Rule or Regulation Promulgated by the State Road Department; and Providing for the Enforcement of the Provisions of and Regulations made in Pursuance of this Act.

"*Whereas,* during the past twelve months approximately thirty per centum (30%) of all cement sold and used in

Florida was manufactured in foreign countries and imported and brought into the State of Folrida, and

"*Whereas,* in view of the fact that large numbers of dwellings, apartment houses, hotels and public buildings are constructed of cement or cement forms an integral part of the construction thereof, and

"*Whereas,* it is of paramount importance to the public safety that only cement measuring up to a minimum standard should be offered for sale, sold or used in the State of Florida, and

"*Whereas,* much of the foreign manufactured cement imported and brought into the State of Florida has been of inferior quality, and

"*Whereas,* the importation and sale or use of foreign cement not only jeopardizes public safety but amounts to unfair competition being forced on this great industry in Florida,

"THEREFORE, BE IT RESOLVED BY THE LEGISLATURE OF THE STATE OF FLORIDA:

"SECTION 1. That the State Road Department of the State of Florida is hereby authorized and required to fix a minimum standard for all cement offered for sale or sold or used in the State of Florida; said standard to be fixed by said State Road Department shall be the standard now in force and used by it in the purchase and use of cement in the construction of public highways, which said standard of cement was set up by the American Society of Testing Materials and approved by the United States Bureau of Public Roads for highway construction; and said standard is hereby fixed and designated as a minimum for all cement offered for sale or sold or used in the State of Florida and it shall be unlawful for any person, persons, association of persons, firm or corporation to sell, offer for sale

or use in the State of Florida any cement in the construction of any hotel, apartment house, rooming house, dwelling or public building of any kind or character which does not measure up to the minimum standard herein fixed.

"SECTION 2. It is hereby made the duty of the State Road Department to inspect all cement imported or brought into the State of Florida from any foreign country and sold or offered for sale or to be used in the State of Florida, and no cement imported and brought into the State of Florida from any foreign country shall be sold, offered for sale or used in the State of Florida until the same has first been inspected by the State Road Department and a tag or other evidence showing such inspection shall be affixed to said cement, or the container thereof, showing that it has been so inspected or approved; and it shall be unlawful for any person, firm, association of persons, or corporation to sell, offer for sale or use in the State of Florida any cement imported or brought into the State of Florida from any foreign country before such inspection has been made by the State of Florida from any foreign country and sold or herein set out and until there has been paid an inspection fee to the State Road Department of fifteen cents (15c) on each one hundred pounds or fraction thereof; said fee so required to be paid for inspection of cement manufactured in a foreign country and imported and brought into the State of Florida shall be paid to the State Road Department and said inspection fee is required to be paid as inspection fees on cement imported and brought from foreign countries into the State of Florida.

"SECTION 3. The State Road Department is hereby authorized to employ all field and other agents and clerical assistance at such times and periods as may enable it to enforce the provisions of this Act, and is hereby authorized

to fix their compensation and said State Road Department is hereby authorized to purchase and install such ·facilities from time to time as it may deem necessary to make fully effectual the provisions of this Act. The State Road Department shall use and expend in enforcing this Act only monies derived and collected hereunder.

"SECTION 4. Said State Road Department is hereby authorized and empowered to promulgate any and all reasonable rules and regulations that it may deem necessary and proper for the proper administration of this Act and said rules and regulations shall have the force and effect of law.

"SECTION 5. It shall be unlawful for any person to obstruct or resist any authorized agent or inspector designated by the State Road Department while such person is in the performance or discharge of any duty imposed upon, authorized or required under the provisions of this Act, or by any rule or regulation adopted as provided hereunder.

"SECTION 6. Any person who shall violate any of the provisions of this Act or shall do or commit any act herein declared to be unlawful or violate any rule or regulation made or promulgated by the State Road Department by virtue of the authority herein, shall be punished by a fine of not more than $2500.00, or imprisonment in the county jail for not more than 12 months, or both in the discretion of the Court.

"SECTION 7. This law shall be construed as an Act intending to secure public safety of the people of the State of Florida.

"SECTION 8. The State Road Department is hereby authorized to designate and utilize the services of the several officers and inspectors of the Health Department, Hotel Commission of the State of Florida, as well as any and all other duly authorized and legally constituted officials who

are vested with police power, in order to enforce and carry out the provisions of this Act in all particulars, and it shall be the duty of all such inspectors and other officials to comply with the orders and requests of said Road Department in connection with the enforcement of this Act, without any additional compensation than that already being paid such inspector or officials, and refusal so to do on the part of any inspector or official shall constitute legal and sufficient grounds for removal from office.

"SECTION 9. In addition to other remedies provided for in this Act, the State Road Department is hereby authorized to proceed in any of the courts of this State by injunction to restrain any threatened continued violation of this Act, and it shall be the duty of each State Attorney, County Prosecuting Attorney, and of the Attorney General, to assist in the enforcement of the provisions of this Act upon the request of the State Road Department.

"SECTION 10. All laws in conflict with the provisions of this Act, be and the same are hereby repealed.

"SECTION 11. This Act shall take effect upon its becoming a law."

The particular act sought to be required of the State Road Department is "to inspect all cement imported into the State of Florida from any foreign country and sold, offered for sale, or to be used in the State of Florida, and affix thereto evidence showing that said cement has been so inspected and collect therefor the inspection fees fixed in said Act, as the same is on file and deposited with the Secretary of State, as well as carry out, perform and discharge all of the other provisions required under said Act to be done and performed by the said State Road Department." The language, "as well as carry out, perform and discharge all of the other provisions required

under said Act to be done and performed by the said State Road Department" may be treated as surplusage because we hold that the Act only requires the State Road Department "to inspect all cement imported into the State of Florida from any foreign country, and sold, offered for sale, or to be used in the State of Florida, and to affix thereto evidence showing that said cement has been so inspected, and to collect therefor the inspection fees fixed by said Act as the same is on file and deposited with the Secretary of State." The State Road Department is authorized by the Act to do certain things but the provisions of the Act in regard to those other things which may be done by the State Road Department are directory and not mandatory.

The first ground of the demurrer is: "First: That said alternative mandamus shows upon its face that the bill, which is made the basis of this action, did not legally and constitutionally become a law of the State of Florida and is not effective as a law."

The record shows that this ground is without merit because each and every provision of Section 17 of Article III of the Constitution of Florida was complied with. The record shows, however, that after the Act had been duly passed by both the Senate and the House and had been authenticated as required by the Constitution, it was transmitted to the Governor as an Act of the Legislature; that thereafter, the Governor, pursuant to the request of the House of Representatives, returned the Act to the House of Representatives. For what purpose or reason is not discussed by the record.

The record further shows that the Act was in due course filed and deposited with the Honorable R. A. Gray as Secretary of State by the Honorable McL. Christie as Speaker

of the 1937 session of the House of Representatives of the State of Florida on the 5th day of June, 1937.

Section 28, Article III of the Constitution of Florida provides as follows:

"Every bill that may have passed the Legislature shall, before becoming a law, be presented to the Governor; if he approves it he shall sign it, but if not he shall return it with his objections to the House in which it originated, which House shall cause such objections to be entered upon its journal, and proceed to reconsider it; if, after such reconsideration, it shall pass both Houses by a two-thirds vote of members present, which vote shall be entered on the journal of each House, it shall become a law. If any bill shall not be returned within five days after it shall have been presented to the Governor (Sunday excepted) the same shall be a law, in like manner as if he had signed it. If the Legislature, by its final adjournment prevent such action, such bill shall be a law, unless the Governor, within ten days after the adjournment, shall file such bill, with his objections thereto, in the office of the Secretary of State, who shall lay the same before the Legislature at its next session, and if the same shall receive two-thirds of the votes present it shall become a law."

Courts of final appellate jurisdiction in this country are not in harmony in regard to the right of the Legislature to recall an Act which has been duly passed and presented to the Governor. In some jurisdictions it is held that after a bill has passed both houses of the Legislature and has been sent to the Governor for approval, it is competent for the Legislature to reconsider its vote on return of the bill to it from the Governor at its request, such request being evidenced by a joint resolution to that effect. See

Ensley v. Simpson, 166 Ala. 356, 52 Sou. 61; Robinson v. City of Ensley, 111 Ala. Sup., 52 Sou. 69.

In Baltimore Fidelity Warehouse Co. v. Canton Lumber Co., 118 Md. 135, 84 Atl. 188, it was held in effect that where a bill had passed both houses of the Legislature and had been sent to the Governor for approval and was afterwards returned to one of the houses at its request in order that it might be amended, it was held that although the request for the return of the bill was not made by joint resolution of both houses of the Legislature, the facts disclosed a concurrent action of both houses in the request and that the Legislature had jurisdiction to reconsider the bill. See also Teen v. State, 79 Texas Criminal Reports 285, 183 S. W. 1144; McKenzie v. Moore, 92 Ky. 216, 17 S. W. 483, 14 L. R. A. 251.

In other jurisdictions it has been held that the Legislature could not, even by joint resolution, recall and reconsider a bill which has been sent to the Governor for approval and that if the Governor should return the bill on request, the Legislature has no power to reconsider it. See Wolfe v. McCaull, 76 Va. 876. In that case the court construed a constitutional provision to the effect that every bill passed by the Senate and House of Delegates and every resolution requiring the assent of both Houses of the Assembly shall, before becoming a law, be presented to the Governor and that if he shall approve it he shall sign it, but if not he shall return it, with his objections, to the House in which it originated which shall proceed to reconsider it, and that if the Governor shall not return it within five days after presentation to him it shall be a law.

The Court discussed the rules of the House of Representatives and the Court held that where the Governor returned a bill without approval or veto for the purpose of

reconsideration in obedience to a joint resolution recalling the bill before the expiration of the time allowed to the Governor for consideration the bill became a law after the expiration of such time without a veto. The Court said: "It is plain that the action of the Governor was a mere act of courtesy on the part of one coordinate branch of the Government toward another and was not intended and can not be construed as a compliance with the requirements of the Constitution, that if he did not approve it he should return it (the bill) with his objections to the House in which it shall have originated which shall enter the objections at large on their journal." And the Court further said: "He (meaning the Governor) could not evade that duty, if he would, by allowing the Legislature to recall the bill from his hands and to defeat by mere non-action a measure they have once declared with due solemnity to have passed."

To like effect is People v. Devlin, 33 N. Y. 269, 28 Am. Dec. 377.

In the instant case there was no joint action of the House and Senate asking a return of the bill from the Governor to either branch of the Legislature and there was no action on the bill after its return to the House of Representatives by the Governor. It so happened that all these transactions transpired on the closing days of the legislative session and at the close of the session the Speaker of the House in due course transmitted the bill to the Secretary of State showing its passage and authentication as hereinbefore stated.

We hold that neither the House of Representatives nor the Senate of the Legislature of Florida could by its independent resolution recall from the hands of the Governor a bill which had been duly passed by the Legislature, had been authenticated and transmitted to the Governor for his con-

sideration, and that the action of the Governor in transmitting the bill to the House of Representatives in the instant case was a matter of courtesy and had no effect upon the validity of the Act which had been duly and constitutionally passed and transmitted to him for his consideration.

The Second, Third, Fourth, Fifth and Sixth grounds of the motion present the same question which we have just dealt with and it is neither necessary to quote the language used in such grounds nor to discuss either of them further, except to say that they are under the state of the record, without merit.

The Seventh ground of the motion is as follows:

"That said alternative writ of mandamus shows upon its face that said purported Act is unconstitutional for the reason that it is a levy by the State of an impost or duty upon a product imported into Florida from a foreign country, and the exclusive right to levy duty or impost is vested under the Constitution of the United States in the Congress."

This ground is untenable because the Act on its face shows that it does not purport to levy an impost or duty upon a product imported to Florida from a foreign country, but on the contrary it is shown that the fee required to be paid is an inspection fee to meet the expense incurred by the State in the enforcement of its inspection law. We may here revert to Article I, Section 10, paragraph 2, of the Constitution of the United States, which provides as follows:

"No State shall, without the consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all Duties and Imposts laid by any State on Imports or Exports shall be for the use of the Treasury of the United States; and all such laws

shall be subject to the Revision and Control of the Congress."

It will be observed that this provision of the Constitution reserves in the States the right to lay imposts or duties on the imports or exports which may be absolutely necessary for executing its inspection laws. But in reserving that power in the States it was provided in this section of the Constitution that the net produce of all duties and imposts laid by any State on imports or exports, shall be for the use of the Treasury of the United States and all such laws shall be subject to the revision and control of Congress. Therefore, if the amount levied in this Act to cover the expense of inspection should exceed the costs of such inspection, the net surplus must be accounted for to the Treasury of the United States.

It will be observed that this power reserved in the States applies only to inspection fees laid on imports and exports. It is well settled that the provisions of paragraph 2, Section 10, Article I, of the Constitution applies only to articles imported from or exported to foreign countries. See New Mexico, ex rel. McLean, v. Denver and R. G. R. Co., 203 U. S. 38, 27 Sup. Ct. 1, 51 L. Ed. 78; Patapsco Guano Co. v. N. C. Board of Agriculture, 18 Sup. Ct. 862, 171 U. S. 345, 43 L. Ed. 191; Woodruff v. Parham, 75 U. S. 123, 19 L. Ed. 382; Pittsburg & S. Coal Co., v. La., 156 U. S. 590, 15 Sup. Ct. 459, 39 L. Ed. 544.

In Patapsco Guano Co. v. N. C. Board of Agriculture, *supra,* the Supreme Court of the United States, speaking through Mr. Justice FULLER, referring to this clause of the Federal Constitution, said:

"The second clause of Section 10 of Article I of the Constitution reads: 'No State shall, without the consent of the Congress, lay any imposts or duties on imports or ex-

ports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts laid by any State on imports or exports shall be for the use of the Treasury of the United States; and all such laws shall be subject to the revision and control of the Congress.'

"The words 'imports' and 'exports' as therein used have been held to apply only to articles imported from, or exported to, foreign countries. Woodruff v. Parham, 8 Wall. 123 (19: 382) ; Pittsburg & S. Coal Company v. Louisiana, 156 U. S. 590, 600 (39:544, 549).

"The clause recognized that the inspection of such articles may be required by the States, and they may lay duties on them to pay the expense of such inspections, but as it would be difficult, if not impossible to determine the necessary amount with exactness and to remove any inducement to excess, it was provided that any surplus should be paid to the United States. As such laws are subject to the revision and control of Congress, it has been suggested that whether inspection charges are excessive or not might be for Congress to determine and not the Courts, which would also be so where inspection laws operate on interstate as well as foreign commerce. Neilson v. Garza, 2 Woods 287; Turner v. Maryland, 107 U. S. 38 (27:370).

"Considered as an inspection law and as not open to attack as in contravention of that clause, the questions still remain whether an inspection law can operate on importations as well as exportations; and whether in this instance the charge was so excessive as to deprive the Act of its character as an inspection law or as a legitimate exercise of protective governmental power, and make it a mere revenue law obnoxious to the objection of being an unlawful interference with interstate commerce. Counsel for plain-

tiff in error insists that this result is deducible from the legislation of North Carolina making appropriations from the funds of the department of agriculture received from the charge on fertilizers or fertilizing materials; as also from the evidence submitted on the hearing.

"It will be more convenient to first dispose of the latter contention."

Then, after citing various statutes of the State of North Carolina, it is said:

"Inspection laws are not in themselves regulations of commerce, and while their object frequently is to improve the quality of articles produced by the labor of a country and fit them for exportation, yet they are quite as often aimed at fitting them, or determining their fitness, for domestic use and in so doing protecting the citizen from fraud. Necessarily, in the latter aspect, such laws are applicable to articles imported into, as well as to articles produced within, a state."

In the case of New Mexico, *ex rel.* McLean, v. Denver and R. G. R. Co., *supra,* Mr. Justice Day, speaking for the Court, said:

"As to the objection predicated on Section 10 of Article I, that section can have no application to the present case, as that provision directly applies only to articles imported or exported to foreign countries. Patapsco Guano Co. v. Board of Agriculture, 171 U. S. 345, 350, 43 L. Ed. 191-193, 18 Sup. Ct. Rep. 862, and cases cited. Moreover, that paragraph of the Constitution expressly reserves the right of the states to pass inspection laws, and if this law is of that character it does not run counter to this requirement of the Constitution.

"The question principally argued is as to the effect of this law upon interstate commerce, and it is urged that it

is in violation of the Constitution, because it undertakes to regulate interstate commerce, and lays upon it a tax not within the power of the local legislature to exact. It has been too frequently decided by this Court to require the restatement of the decisions, that the exclusive power to regulate interstate commerce is vested by the Constitution in Congress and that other laws which undertake to regulate such commerce or impose burdens upon it are invalid. This doctrine has been reaffirmed and announced in cases decided as recently as the last term of this court. Houston & T. C. R. Co. v. Mayes, 201 U. S. 321, 50 L. Ed., 772, 26 Sup. Ct. Rep. 491; McNeil v. Southern R. Co, 202 U. S. 543, 50 L. Ed. 1142, 26 Sup. Ct. Rep. 722. While this is true, it is equally well settled that a state, or a territory, for the same reasons in the exercise of the police power may make rules and regulations not conflicting with the legislation of Congress upon the same subject and not amounting to regulations of interstate commerce. It will only be necessary to refer to a few of the many cases decided in this court holding valid enactments of legislatures having for their object the protection, welfare and safety of the people, although such laws may have an effect upon interstate commerce. Missouri K. & T. R. Co. v. Haber, 169 U. S. 613-635, 42 L. Ed. 878-885, 18 Sup. Ct. Rep. 488; Chicago M. & St. P. R. Co. v. Solan, 169 U. S. 133, 42 L. Ed. 688, 18 Sup. Ct. Rep. 289; Pennsylvania R. Co. v. Hughes, 191 U. S. 477, 48 L. Ed. 268, 24 Sup. Ct. Rep. 132. The principle decided in these cases is that a state or territory has the right to legislate for the safety and welfare of its people, and that this right is not taken from it because of the exclusive right of Congress to regulate interstate commerce, except in cases where the attempted exercise of authority by the Legislature is in conflict with an

Act of Congress, or is an attempt to regulate interstate commerce. In Patapsco Guano Co. v. Board of Agriculture, *supra,* it was directly recognized that the state might pass inspection laws for the protection of its people against fraudulent practices and for the suppression of frauds, although such legislation had an effect upon interstate commerce. The same principle was recognized in Neilson v. Garza, 2 Woods 287, Fed. Cas. No. 10,091,—a case decided by Mr. Justice BRADLEY on the circuit and quoted from at length with approval by Mr. Chief Justice FULLER in the Patapsco case."

So, it appears that there is a clear distinction to be drawn between the right of states to legislate in so far as inspection is concerned in regard to merchandise imported or exported to or from a foreign country and the right of a state to legislate in so far as inspection is concerned in regard to merchandise in interstate commerce between the states. When legislating as to inspection of merchandise imported into the state from foreign countries the Constitution by the clause hereinabove referred to has reserved in the state specifically the power to legislate concerning the inspection of such merchandise so imported, but by the specific provision of the Constitution has made such laws subject to the revision and control of the Congress. The purpose of this provision was that the states might reserve the right to protect the health, property and welfare of its citizens but with the power lodged in the Congress of the United States to revise or control such legislation so that it would not unlawfully interfere with commerce between the nations.

Now it is clear that if the fee here involved constituted a tax levied for revenue, it would violate the Federal Constitution as above referred to. See Mulger v. Kansas, 131

U. S. 661, 31 L. Ed. 210; Minnesota v. Barber, 10 Sup. Ct. Rep. 862, 136 U. S. 313, 34 L. Ed. 455; Henderson v. New York, 99 U. S. 259, 23 L. Ed. 543; Voight v. Wright, 11 Sup. Ct. Rep. 855, 141 U. S. 62, 35 L. Ed. 638; Brimmer v. Rehman, 11 Sup. Ct. 213, 138 U. S. 78, 34 L. Ed. 862.

In many cases it has been held that the state in the. exercise of the police power may make rules and regulations not conflicting with the legislation of Congress upon the same subject and not amounting to regulations of interstate commerce and enactments of legislatures have been held valid which have for their object the protection of the welfare and safety of the people; although such laws may have an effect upon interstate commerce. ·See Mo. K. & T. R. Co. v. Haber, 18 Sup. Ct. 488, 169 U. S. 613, 42 L. Ed. 878; Chicago M. & St. P. R. Co. v. Solan, 18 Sup. Ct. 289, 169 U. S. 133, 42 L. Ed. 688; Neilson v. Garza, 2 Woods 287, Fed. Cas. No. 10,091.

In the light of the decisions, the provisions of the Constitution and the provisions of the Act under consideration, we hold that it constitutes a valid inspection law; that the purpose of the Act is for the safety and welfare of the consumer of commercial cement in the State of Florida.

The Act sets up a standard which must be met and complied with in all cement sold in the State of Florida for the purposes mentioned in the Act. That standard is shown by the record to be the standard set up by the American Society of Testing Materials and approved by the United States Bureau of Public Roads for highway construction. It is made a criminal offense for any person, persons or association of persons; firm or corporation to sell, offer for sale or use in the State of Florida any cement in the construction of any hotel, apartment house, rooming house, dwelling or public building of any kind or character which

does not measure up to the minimum standard fixed by the Act. The inspection of cement imported from foreign countries was deemed by the Legislature to be necessary as a protection to dealers in Florida against having foisted on them a commodity which can not be resold under the laws of Florida and which, because of its inferior quality, constitutes unfair competition in this commodity. In New Mexico, *ex rel.* McLean, v. Denver & R. G. R. Co., *supra,* in discussing the Act there under consideration it was said:

"It is argued that this Act lays a special burden upon interstate commerce, because under the law, hides not offered for transportation are not required to be inspected after thirty days in slaughterhouses and not at all outside of slaughterhouses. But legislation is not void because it meets the exigencies of a particular situation. Other statutory provisions apply to property remaining in the territory, where possibly it may be found and identified. When shipped beyond the limits of the territory and means of reaching it are beyond local control, and it is the purpose of Sections 3 and 4 of the Act of 1901 to preserve within the territory a record of the brands identifying the property and naming the purchaser or shipper. Certainly we cannot judicially say that there can be no valid reason for making the inspection in question apply only to hides offered for transportation beyond the territory, and that for that reason the tax is an arbitrary discrimination against interstate traffic."

It is just as certain that we cannot judicially say that there can be no valid reason for making the inspection here under consideration apply only to cement imported into the State of Florida from a foreign country and that for that reason the inspection and fee incident thereto is arbitrary discrimination against commerce between the nations.

The Eighth ground of demurrer is as follows:

"Eighth: Said purported Act sought to be enforced as law is unconstitutional for the further reason that it is discriminatory in that it imposes an impost or duty in the form of inspection fees upon imported cement from foreign countries and does not require the payment of any inspection fees on domestic cement."

What has been said above is sufficient to dispose of this ground.

The Ninth ground of the demurrer, that the Act violates Section 16 of Article 3 of the Constitution of Florida in that it contains more than one subject and matters properly connected therewith, is without merit.

The Tenth, Eleventh, Twelfth, Thirteenth, Fourteenth and Fifteenth grounds of demurrer are as follows:

"Tenth. Said bill arbitrarily interferes with the right to contract.

"Eleventh: It affirmatively appears that the bill sets up no reasonable basis for fixing minimum standards for cement.

"Twelfth: Said bill is discriminatory and violates Section 1, Article XIV, Constitution of the United States in that it provides for inspection of foreign cement only.

"Thirteenth: It manifestly appears that said bill tends to create a monopoly.

"Fourteenth: It affirmatively appears that the allegations of the alternative writ fail to show a clear legal duty which respondents may be compelled to perform.

"Fifteenth: The Alternative writ shows on its face that Relator is not entitled to the peremptory writ prayed for."

We think that what we have heretofore said sufficiently states reasons for disposing of these latter grounds of demurrer adversely to the contention of the Respondents.

While the question has not been presented by either of the respective parties, it has been suggested that the Respondents may not be heard to question the validity of the Act on authority of the opinion and judgment in the case of State, *ex rel.* A. C. L. R. R. Co., v. Board of Equalizers of Florida, 84 Fla. 592, 94 Sou. 681.

In the case of State, *ex rel.* A. C. L. R. R. Co., v. Board of Equalizers of Florida, *supra,* the court refers to the case of Board of Public Instruction of Santa Rosa County v. Croom, *et al.,* reported 57 Fla. 347, 48 Sou. 641, and says:

"The case of Board of Public Instruction for Santa Rosa County v. Croom, 57 Fla. 347, 48 South. Rep. 641, is not in conflict with the doctrine herein announced. In that case Mr. Knott's interest was directly affected. He was State Treasurer, and under a heavy bond. If he paid money out of the treasury under the provisions of an unconstitutional Act, he or his bondsman would have had to bear the loss. His right to raise the question of the constitutionality of the Act involved did not grow out of the obligation of his oath of office, nor out of his official position, but because he was liable to be injured pecuniarily."

There is no material difference between the status of the State Road Department in the instant case and the status of Mr. Croom as Comptroller and Mr. Knott as State Treasurer in that case. If the State Road Department complied with the mandatory provision of the Act, the members of that department would be required to pledge or expend public funds in so doing and while if the Act should be enforced and should be held valid the fund pledged or expended would ultimately come from those paying the inspection fees, such fact does not place the State Road Department in such position that it is required to expend public money pursuant to provisions of a legislative Act which

it in good faith believes to be invalid and unenforceable. The Act here under consideration is of such a nature that its constitutionality may have well been, and in good faith, doubted. One who is required to pay out public funds should be at least reasonably certain that the same are paid out under valid law. See State of Florida, *ex rel.* Harrell, *et al.,* as Board of County Commissioners of Washington County, Fla., and C. W. Nelson v. Fred P. Cone, *et al.,* as Board of Administration of State of Florida; J. M. Lee as Comptroller and Secretary of Board of Administration, W. V. Knott as State Treasurer and County Treasurer *ex officio* of Washington County, Florida, filed at this Term of the Court. See also State, *ex rel.,* v. Neville, 123 Fla. 745, 167. So. 650, Coppedge, *et al.,* v. State, 99 Fla. 358, 127 So. 319.

The above enunciation is sound, although we recognize the rule to be that before any legislative Act can be judicially declared unconstitutional, its repugnance to the Constitution must be clearly shown and to the exclusion of all reasonable doubt.

It, therefore, follows that while the reasonable doubt of the constitutionality of a legislative Act may justify an officer charged with the duty of expending public funds only pursuant to valid law, in declining in the absence of a controlling court order, to pay out public funds under provisions of such a doubtful statute, such a reasonable doubt will not justify a court in striking down the Act as being unconstitutional.

For the reasons stated, the demurrer and motion to quash is denied and respondents are allowed ten days within which to file answer or return, in default of which peremptory writ will issue.

ELLIS, C. J., and TERRELL, J., concur.

610

Whitfield, P. J., and Brown and Chapman, J. J., concur in the opinion and judgment.